1 F.3d 571
 42 Soc.Sec.Rep.Ser. 17, Unempl.Ins.Rep. CCH 17453A
Harold W. DOTSON, Plaintiff-Appellant,
v.
Donna E. SHALALA,* Secretary of the Department
of Health and Human Services of the United States
of America, Defendant-Appellee.
 No. 92-3148.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 6, 1993.
Decided Aug. 2, 1993.
 
 Thomas M. Henry, Peoria, IL (argued), for plaintiff-appellant.
 Michael C. Messer (argued), Dept. of Health and Human Services, Region V, Office of Gen. Counsel, Chicago, IL, K. Tate Chambers, Asst. U.S. Atty., Peoria, IL, for defendant-appellee.
 Before RIPPLE and MANION, Circuit Judges, and ENGEL, Senior Circuit Judge.**
 ENGEL, Senior Circuit Judge.
 
 
 1
 Harold Wayne Dotson, a Supplemental Security Income claimant, appeals the district court's grant of summary judgment in favor of Donna E. Shalala, Secretary of the Department of Health and Human Services. In granting summary judgment, the district court upheld an administrative law judge's finding that Dotson was engaging in substantial gainful activity by supporting a $200- to $300-per-day heroin and cocaine habit through illegal means. See Dotson v. Sullivan, 813 F.Supp. 651 (C.D.Ill.1992). Because we agree that illegal activity can constitute substantial gainful activity, we affirm.
 
 I. BACKGROUND
 
 2
 Dotson applied for Supplemental Security Income benefits on September 25, 1989, alleging disability since 1968 due to asthma, multiple allergies, and past drug abuse. The Social Security Administration denied his application on January 10, 1990, and again upon reconsideration on May 21, 1990. Dotson then requested and received a hearing before an administrative law judge ("ALJ"). At the administrative hearing, Dotson testified that he uses $200 to $300 worth of heroin and cocaine each day. Additionally, he testified that he supports his drug habit by hustling. When asked to define hustling, Dotson replied: "steal, beg, whatever, you know."
 
 
 3
 With regard to his begging, Dotson stated that he usually panhandles at the Warner Homes, which are located in a poor neighborhood in Peoria, Illinois. As to Dotson's thievery, the following colloquy occurred during the administrative hearing:
 
 
 4
 Q. [By ALJ] Where do you steal at?
 
 
 5
 A. [By Dotson] You can do that anywhere. Wherever we can find a place to.
 
 
 6
 Q. Give me an idea. Give me some examples.
 
 
 7
 A. The mall, downtown, wherever. You just ride and look and, you know.
 
 
 8
 Q. How long do you spend riding and looking until you find a place to steal?
 
 
 9
 A. As long as you have to.
 
 
 10
 Q. Like how long?
 
 
 11
 A. Sometime--
 
 
 12
 Q. All day long?
 
 
 13
 A. Sometimes it takes all day.
 
 
 14
 Q. What kinds of things have you stolen this month?
 
 
 15
 A. This month?
 
 
 16
 Q. Uh huh.
 
 
 17
 A. I, well, I like to, I try to concentrate on saws.
 
 
 18
 Q. On what?
 
 
 19
 A. Saws.
 
 
 20
 Q. Saws?
 
 
 21
 A. You know, the chainsaws, the little bitty chainsaws?
 
 
 22
 Q. Where do you find those at?
 
 
 23
 A. Everywhere, everywhere.
 
 
 24
 Q. And once you get them, what do you do with them?
 
 
 25
 A. You sell them.
 
 
 26
 Q. To who?
 
 
 27
 A. A lot of people buy.
 
 
 28
 Q. Well, where do you find--I wouldn't imagine there would be a lot of demand for them in Warner homes.
 
 
 29
 A. No.
 
 
 30
 Q. Where do you go to sell the chainsaws?
 
 
 31
 A. Different businesses.
 
 
 32
 Q. Like what?
 
 
 33
 A. Small businesses.
 
 
 34
 Q. Give me some examples.
 
 
 35
 A. Like small stores or cleaners, different places like that.
 
 
 36
 Q. Do you have to travel around to these places? How long does it take you to find somebody to buy a saw?
 
 
 37
 A. Usually, they already, you have been--you kind of already know they probably want one.
 
 
 38
 Q. So you have already canvassed these places earlier? You have gone out and--
 
 
 39
 A. No, you have probably sold them stuff and they can give you kind of an idea about what else they might like, you know.
 
 
 40
 Based on Dotson's testimony, the ALJ found that Dotson's stealing and panhandling constituted substantial gainful activity ("SGA") worth an average of approximately $5,600 per month and, accordingly, denied his claim for SSI benefits. Specifically, the ALJ found that, due to the poor area in which Dotson panhandles, the bulk of his income must come from illegal means. As to the nature of Dotson's criminal endeavors, the ALJ concluded:
 
 
 41
 In order to steal he must "case" the area in which he has determined to steal the property. He must then plan on how he is going to steal the property and then actually steal it. During the month in which the hearing was held the claimant was stealing chainsaws. Lifting and carrying the chainsaws would also be significant physical activity. The planning and execution of the larceny entails significant mental activity. From these activities the claimant earns enough money to support his cocaine habit and provide him with other money in substantial amounts exceeding $200 to $300 a day. [Emphasis in original.]
 
 
 42
 On July 9, 1991, the Appeals Council declined to review the ALJ's decision. Dotson then filed the instant action against the Secretary of the Department of Health and Human Services ("Secretary") in federal court. On July 1, 1992, with cross-motions for summary judgment before it, the district court granted the Secretary's motion for summary affirmance and entered a separate judgment against Dotson and in favor of the Secretary. See Dotson v. Sullivan, 813 F.Supp. 651 (C.D.Ill.1992). This appeal followed.
 
 II. DISCUSSION
 
 43
 Dotson essentially raises four arguments. First, he believes that illegal activities undertaken solely to satisfy a drug addiction cannot constitute SGA. Second, assuming that illegal activity can constitute SGA, Dotson claims that the ALJ's finding of SGA in his case is unsupported by substantial evidence. Third, Dotson contends that if illegal activity undertaken to support a drug habit can constitute SGA, then the Secretary is required to deduct the cost of the narcotics from the claimant's income as an impairment-related work expense. Fourth and finally, Dotson believes that using illegal activities to furnish the basis for finding SGA denies him due process and equal protection of the laws under the United States Constitution.
 
 
 44
 A. OVERVIEW.
 
 
 45
 The Social Security Act ("Act"), as amended, 42 U.S.C. Sec. 301 et seq., provides for the payment of benefits to disabled persons. Title II of the Act governs the payment of Old-Age, Survivors, and Disability Insurance ("OASDI") benefits to disabled persons who have contributed to the Social Security program. 42 U.S.C. Sec. 401 et seq. Title XVI of the Act, the title under which Dotson filed his application for benefits, provides for the payment of Supplemental Security Income ("SSI") benefits to disabled persons who are indigent. 42 U.S.C. Sec. 1382 et seq.; see generally Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290, 96 L.Ed.2d 119 (1987). Both Titles II and XVI define disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. Secs. 423(d)(1)(A), 1382c(a)(3)(A).
 
 
 46
 Pursuant to statutory authority, the Secretary has promulgated regulations establishing a five-step sequential analysis for determining whether an SSI claimant is disabled. See 20 C.F.R. Sec. 416.920; Sullivan v. Zebley, 493 U.S. 521, 525, 110 S.Ct. 885, 888, 107 L.Ed.2d 967 (1990).[1] The first step of the process, and the only one relevant for purposes of this appeal, requires the Secretary to determine whether the claimant is engaging in SGA. See 20 C.F.R. Sec. 416.920(a). A finding of SGA means that the claimant is ineligible for SSI benefits. Id. at Sec. 416.920(b); Yuckert, 482 U.S. at 140, 107 S.Ct. at 2290. In this case, because the ALJ found that Dotson's stealing and panhandling constituted SGA, he denied Dotson's claim for benefits without moving to the next step in the sequential analysis.[2]
 
 
 47
 B. ILLEGAL ACTIVITY AS SGA.
 
 
 48
 Our research reveals that we are the first appellate court to address the issue of whether illegal activity can support a finding of SGA. The handful of federal trial courts faced with this question, including the district court below, have answered unanimously in the affirmative.[3] Because the ALJ and district court's determination that illegal activity can constitute SGA is a construction of the Secretary's regulations, we review this decision of law de novo. See Johnson v. Sullivan, 922 F.2d 346, 356 (7th Cir.1990).
 
 
 49
 As the definition of disability quoted above indicates, the inability to engage in SGA is a statutory prerequisite to obtaining either SSI or OASDI benefits. Nonetheless, Congress delegated to the Secretary the responsibility for defining SGA. 42 U.S.C. Sec. 1382c(a)(3)(D) (Title XVI). In response to the Act's mandate, and as the components of the term suggest, the Secretary has defined SGA as "work activity that is both substantial and gainful." See 20 C.F.R. Sec. 416.972. Work activity is substantial if it "involves doing significant physical or mental activities." Id. at Sec. 416.972(a). Work activity is gainful if it is "the kind of work usually done for pay or profit, whether or not a profit is realized." Id. at Sec. 416.972(b); see generally Callaghan v. Shalala, 992 F.2d 692 (7th Cir.1993) (discussing elements of SGA).[4] Activities such as taking care of one's self, performing household tasks, engaging in hobbies or therapy, and attending school, clubs, or social programs generally do not constitute SGA. 20 C.F.R. Sec. 416.972(c).
 
 
 50
 The foregoing framework underscores the dual nature of an ALJ's inquiry into whether a claimant is engaging in SGA. Under the substantiality prong of the analysis, an ALJ considers the nature of the undertakings comprising the claimant's work activity. Thus, the degree to which a claimant's work requires the use of "expertise, skills, supervision and responsibilities" becomes relevant in determining whether that work constitutes SGA. See 20 C.F.R. Sec. 416.973(a). Additionally, an ALJ will consider how well a claimant performs his or her work activities:
 
 
 51
 If you do your work satisfactorily, this may show that you are working at the substantial gainful activity level. If you are unable, because of your impairments, to do ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work, this may show that you are not working at the substantial gainful activity level. If you are doing work that involves minimal duties that make little or no demands on you and that are of little or no use to your employer, or to the operation of a business if you are self-employed, this does not show that you are working at the substantial gainful activity level.
 
 
 52
 Id. at Sec. 416.973(b).
 
 
 53
 In evaluating the gainfulness of a claimant's work, an ALJ's inquiry is more circumscribed. Here, as noted above, the claimant's undertakings need be only of the type that normally result in pay or profit. In other words, a claimant can be found to be engaging in SGA without earning any income. See Callaghan, 992 F.2d at 695-96 (unprofitable business owner was engaging in SGA).[5] This is not to say that a claimant's earnings are irrelevant for purposes of determining whether he or she is engaging in SGA. See, e.g., 20 C.F.R. Sec. 416.974(a)(1). To the contrary, a claimant who earns on average less than $300 per month is presumed not to be engaging in SGA, while a claimant who makes more than an average of $500 per month is presumptively ineligible for SSI benefits. Id. at Secs. 416.974(b)(3)(vii), (b)(2)(vii).[6] As with most legal presumptions, however, these income guidelines are rebuttable and "do not relieve an ALJ of the duty to develop the record fully and fairly." Dugan v. Sullivan, 957 F.2d 1384, 1390 (7th Cir.1992) (citations and internal quotations omitted).
 
 
 54
 Against this background, Dotson concedes--as he must--that in at least some instances illegal activity can be substantial gainful activity. Dotson continues, however, that the context in which his thievery occurs precludes its use in determining whether he has been engaging in SGA. In his own words:
 
 
 55
 A drastic distinction exists between a person who is engaged in illegal activity for effectively the equivalent of a legal career such as being a drug dealer, illegal drug importer or other illegal activity which has counterparts in lawful activities such as business managers, business owners and the like, and a thief who steals merely to feed the cravings of unquenchable drug addiction.
 
 
 56
 Aplnt's. Br. at 18. Considering Dotson's claim under the scheme set forth above, we conclude that he forwards a distinction without a difference.
 
 
 57
 Admittedly, even a cursory examination of the regulations reveals that the Secretary envisioned their application within a traditional employment context. Importantly, however, nothing in the Act or its regulations specifically requires SGA to be lawful. This silence, we believe, suggests that illegal activities can constitute SGA. The inference is strengthened, moreover, when considering that the relevant considerations noted above apply with almost equal ease irrespective of the legality of the activities involved. Thus, one can envision a number of illegal activities that might not rise to the level of SGA.[7] Whether legally or illegally employed, the regulations direct an ALJ to focus on whether the claimant is performing significant physical or mental activities, and doing so with the intent of earning money or making a profit.
 
 
 58
 Moreover, it must be remembered that an ALJ performs the SGA analysis as one of five steps used to determine whether a person is disabled and, consequently, unable to function within our economy. A claimant who can manage through illegal means is just as undeserving of benefits as a claimant who can survive without violating the law. For this reason, there is no difference between the addict who spends all of his lawfully derived earnings on narcotics and the one who illegally obtains, and then exhausts, her income. Both are fueled, to quote Dotson, by the "cravings of unquenchable drug addiction." The only real distinction between the two--the lawfulness of their income--finds no cognizance under the Act and its interpretive regulations.[8]
 
 
 59
 Finally, our conclusion that illegal activity can constitute SGA derives substantial support from the well-established tax principle that unlawful earnings come within the meaning of the term "gross income" and are thus taxable. See, e.g., James v. United States, 366 U.S. 213, 218, 81 S.Ct. 1052, 1054, 6 L.Ed.2d 246 (1961) (plurality opinion of Warren, C.J.), overruling Commissioner v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752 (1946); United States v. Sullivan, 274 U.S. 259, 263, 47 S.Ct. 607, 607, 71 L.Ed. 1037 (1927). Notably, the Act has adopted the tax code's definition of gross income for purposes of determining whether a SSI claimant's income is sufficiently high so as to render him or her ineligible for benefits. 42 U.S.C. Sec. 1382(d); see also 20 C.F.R. Sec. 416.1110(b).[9] Indeed, one of the concerns motivating the plurality in James, "to remove the incongruity of having the gains of the honest laborer taxed and the gains of the dishonest immune," 366 U.S. at 218, 81 S.Ct. at 1054, provides the crux of our reasoning in this case.
 
 
 60
 C. SUFFICIENCY OF THE EVIDENCE.
 
 
 61
 Having concluded that illegal activity can constitute SGA, we must next determine whether the ALJ properly applied the legal standard in Dotson's case. Our inquiry is a limited one. We will not decide facts anew, reweigh evidence, or substitute our judgment for the Secretary's. Shroeter v. Sullivan, 977 F.2d 391, 394 (7th Cir.1992). Rather, we look to see whether "substantial evidence" supports the ALJ's findings. See 42 U.S.C. Sec. 1383(c)(3) (citing 42 U.S.C. Sec. 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).
 
 
 62
 Dotson first contends that the ALJ had before him no evidence of specific illegal acts which could support a finding of SGA. Secondly, he believes the ALJ erroneously assumed that he paid full street-value for the narcotics he used and, thus, overestimated the amount of income needed to support his drug habit. We address each claim in order.[10]
 
 
 63
 Dotson's first claim, that the record lacks any evidence of illegal activities, is belied by his own testimony and by the reasonable inferences drawn therefrom by the ALJ. For example, when the ALJ asked Dotson to describe what types of items he had stolen in the month during which the administrative hearing was held, Dotson replied: "I try to concentrate on saws.... You know, the chainsaws, the little bitty chainsaws." Dotson then went on to explain, in some detail, how he would sell the stolen items. Additionally, the ALJ made at least one specific inquiry into the substantiality of Dotson's activities, asking him how long it takes him to find a place to steal.
 
 
 64
 We grant to Dotson his point that the record contains no evidence concerning any specific act of thievery. Also, we agree with him that the ALJ could have more fully developed the record as to the nature of his criminal undertakings. Nevertheless, we cannot say that the record before us contains less than substantial evidence that Dotson's thievery required the significant use of his physical and mental skills, and that those skills were applied within a context designed to produce pay or profit. See 20 C.F.R. Secs. 416.972(a), (b). In short, Dotson's testimony allowed the ALJ to reasonably conclude that the effort required to steal the chainsaws with regularity constituted SGA, and we therefore uphold this aspect of the ALJ's decision. A more exacting inquiry, while desirable, was not required.
 
 
 65
 Dotson's second argument, that the ALJ overestimated the cost of the narcotics, is also unpersuasive. As an initial matter, this claim suffers from the same weakness that proved fatal to his first argument, that is, Dotson testified without contradiction to using $200 to $300 worth of heroin and cocaine daily.[11] If Dotson actually paid less for his narcotics, one would have expected him to testify accordingly. Furthermore, this case is unlike Curtis v. Sullivan, 764 F.Supp. 119 (N.D.Ill.1991), where the ALJ simply imputed to the claimant an income sufficient to satisfy his addiction. In that case, the ALJ concluded, in the absence of evidence as to legal or illegal employment, that the claimant had to be engaging in SGA in order to support his expensive drug habit. Here, on the other hand, Dotson's testimony as to his thievery filled the gap. From this, the ALJ was justified in finding that Dotson's earnings surpassed $500 per month, thereby rendering him presumptively ineligible for SSI benefits. See 20 C.F.R. Sec. 416.974(b)(2)(vii).
 
 
 66
 We agree with the court in Curtis that simply because a claimant has a severe and expensive drug habit does not mean that the person is engaging in SGA to support it. 764 F.Supp. at 120-21. The record must contain substantial evidence, of the type outlined in Section II(B), supra, that the claimant is engaging in legal or illegal activities that are substantial and gainful. Because we have held that the ALJ's decision in this case comports with those requirements, we reject Dotson's challenge to the evidence supporting the Secretary's decision.
 
 
 67
 D. NARCOTICS AS AN IMPAIRMENT-RELATED WORK EXPENSE.
 
 
 68
 Dotson next raises the interesting yet ultimately unavailing argument that, if illegal activities undertaken to maintain a drug habit can constitute SGA, then the cost of the narcotics must be deducted from income as an impairment-related work expense ("IRWE") under 42 U.S.C. Sec. 1382a(b)(4)(B)(ii) and its interpretive regulations, 20 C.F.R. Sec. 416.976. As we discuss below, Dotson misapprehends the nature of IRWEs.
 
 
 69
 42 U.S.C. Sec. 1382a(b)(4)(B)(ii), enacted as part of the Social Security Disability Amendments of 1980, Pub.L. No. 96-265, 94 Stat. 441 (1980), provides:
 
 
 70
 In determining the income of an individual (and his eligible spouse) there shall be excluded ... if such individual (or such spouse) is disabled but not blind (and has not attained age 65, or received benefits under this subchapter (or aid under a State plan approved under section 1352 or 1382 of this title) for the month before the month in which he attained age 65) ... such additional amounts of earned income of such individual, if such individual's disability is sufficiently severe to result in a functional limitation requiring assistance in order for him to work, as may be necessary to pay the costs (to such individual) of attendant care services, medical devices, equipment, prostheses, and similar items and services (not including routine drugs or routine medical services unless such drugs or services are necessary for the control of the disabling condition) which are necessary (as determined by the Secretary in regulations) for that purpose, whether or not such assistance is also needed to enable him to carry out his normal daily functions, except that the amounts to be excluded shall be subject to such reasonable limits as the Secretary may prescribe.
 
 
 71
 See also 42 U.S.C. Sec. 1382c(a)(3)(D) (restating same). In 1983, the Department of Health and Human Services promulgated 20 C.F.R. Sec. 416.976. See 48 Fed.Reg. 21940 (1983). These regulations established a five-part test for determining the deductibility of an IRWE:
 
 
 72
 We will deduct impairment-related work expenses if--
 
 
 73
 (1) You are otherwise disabled ...;
 
 
 74
 (2) The severity of your impairment(s) requires you to purchase (or rent) certain items and services in order to work;
 
 
 75
 (3) You pay the cost of the item or service....;
 
 
 76
 (4) You pay for the item or service in accordance with paragraph (d) of this section; and
 
 
 77
 (5) Your payment is in cash (including checks and other forms of money). Payment in kind is not deductible.
 
 
 78
 20 C.F.R. Sec. 416.976(b). With respect to the deductibility of drugs as an IRWE, the regulations provide:
 
 
 79
 If you must use drugs ... to control your impairment(s), the payments you make for them may be deducted. The drugs or services must be prescribed (or utilized) to reduce or eliminate the symptoms of your impairment(s) or to slow down its progression.
 
 
 80
 * * * * * *
 
 
 81
 Examples of deductible drugs ... are anticonvulsant drugs to control epilepsy ...; antidepressant medication for mental disorders; medication used to allay the side effects of certain treatments; ... and immunosuppressive medications that kidney transplant patients regularly take to protect against graft rejection.
 
 
 82
 20 C.F.R. Secs. 416.976(c)(5)(i), (ii). Consistent with the Act's objective, use of the drugs must be necessary to allow the person to perform work. See Soc.Sec.R. 84-26 at 18 (1984) ("Routine drugs ... are 'needed' when they are required to control the disabling condition, thereby enabling the individual to function at work.").
 
 
 83
 Dotson argues that, due to the severity of his drug addiction, he needs the cocaine and heroin in order for him to steal and panhandle. (Of course, he steals and panhandles so that he can purchase more cocaine and heroin, so that he can continue to steal and panhandle--and thus the cycle of addiction continues.) Because he needs the narcotics in order to engage in SGA, Dotson continues, he believes that the cost of the cocaine and heroin should be deducted from his earnings as an IRWE.
 
 
 84
 Sadly, we have no reason to disbelieve Dotson's self-characterization. Unfortunately for him, however, the regulations comprehend more than mere addiction to a substance before the cost of that substance will be considered an IRWE. As the statute and regulations reveal, a number of obstacles lie in the path of Dotson's argument. We content ourselves, however, to focus upon the requirement that in order to be an IRWE a drug must "reduce or eliminate" the symptoms of a claimant's impairment, or "slow down its progression." 20 C.F.R. Sec. 416.976(c)(5)(i). In the face of Dotson's claim that his disability stems from drug abuse, he cannot hope to maintain the argument that his continued use of heroin and cocaine reduces or eliminates the symptoms of his impairment. Rather, Dotson's use of drugs serves as the basis of his alleged disability. And far from slowing Dotson's dependency upon narcotics, his continued use of heroin and cocaine only exacerbates his disability. With these considerations in mind, we must reject Dotson's claim for an IRWE.
 
 
 85
 E. THE CONSTITUTIONAL CLAIMS.
 
 
 86
 Dotson lastly argues that using illegal activity to constitute SGA violates his rights to due process and equal protection of the laws under the United States Constitution, although he has encountered some difficulty in articulating the precise nature of his constitutional complaints. It would seem that his due process argument--one which might be more properly construed as an administrative challenge to the regulations--reduces to the theory that the ALJ's decision in this case attempts to override Congress' intent to provide SSI benefits to substance abusers and, therefore, is void for want of a rational basis. His equal protection claim, on the other hand, appears based on the assertion that, under the Secretary's position, rich drug addicts will be treated preferentially to the disadvantage of poor ones. We briefly address each of his arguments.
 
 
 87
 1. Due Process.
 
 
 88
 To establish a due process violation, Dotson faces the well-settled and formidable burden of proving that the Secretary's regulations, as we have interpreted them, lack a rational basis. See, e.g., Weinberger v. Salfi, 422 U.S. 749, 768, 95 S.Ct. 2457, 2468, 45 L.Ed.2d 522 (1975) ("the Due Process Clause can be thought to interpose a bar only if the statute [or, as here, a regulation] manifests a patently arbitrary classification, utterly lacking in rational justification [citation omitted]"). Moreover, that rational basis need not be expressed explicitly by Congress or the administrative agency; "any state of facts reasonably may be conceived to justify it." Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (citation omitted).
 
 
 89
 Initially, we note that interpreting the Secretary's regulations as allowing illegal activity to constitute SGA does not interfere with Congress' intent, assuming there is one, to provide disability benefits to substance abusers.[12] Rather, such an interpretation prevents only those substance abusers who are engaging in SGA, whether legally or illegally employed, from receiving SSI benefits reserved for disabled persons who are also poor. See Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290, 96 L.Ed.2d 119 (1987) ("Title XVI of the Act provides for the payment of disability benefits to indigent persons...." [Emphasis added.] Thus, the Secretary's regulations coincide with the SSI program's underlying purpose.
 
 
 90
 Moving to the next level, Dotson's myopic view of Congress' intent in the statutory context serves to highlight the flaw in his constitutional argument. Simply put, we cannot say that regulations which preclude the disbursement of federal disability benefits to persons who are engaging in substantial and gainful activity, regardless of the activity's legality, constitutes a "patently arbitrary classification" warranting judicial intervention. To the contrary, working within a system where the limited supply of federal funds will never satisfy the deserving demand, we are hard pressed to think of a better dividing line than the one drawn by the Secretary. Having said this much, we must reject Dotson's due process claim.
 
 
 91
 2. Equal Protection.
 
 
 92
 Dotson faces an equally difficult burden when arguing to this court that the Secretary's regulations violate the equal protection component of the Fifth Amendment. Because a statute's or regulation's differential impact upon the poor versus the wealthy, by itself, does not subject that distinction to strict judicial scrutiny, see, e.g., Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 458, 108 S.Ct. 2481, 2487, 101 L.Ed.2d 399 (1988), Dotson must prove that the classification drawn by the Secretary's regulations fails to rationally further a legitimate interest, Zobel v. Williams, 457 U.S. 55, 60, 102 S.Ct. 2309, 2312, 72 L.Ed.2d 672 (1982). Under such a standard, Dotson's constitutional claim again must fail.
 
 
 93
 Dotson argues that the Secretary's position, if implemented, will hurt only poor drug abusers because rich ones, who presumably will have paid into the Social Security system, will be eligible to receive OASDI benefits under Title II of the Act. This argument misses the mark for the simple reason that OASDI claimants, just like SSI claimants, must navigate the same five-step administrative process, the first of which requires that the claimant not be engaging in SGA. Compare 42 U.S.C. Sec. 423(d)(1)(A) and 20 C.F.R. Sec. 404.1520(a) (Title II) with 42 U.S.C. Sec. 1382c(a)(3)(A) and 20 C.F.R. Sec. 416.920 (a) (Title XVI).[13] Even if Dotson could maintain such an argument, we would be inclined to reject it because the Secretary's classification seems rationally to further the legitimate interest of rewarding those persons with a prior attachment to the work force who have contributed to the Social Security system.
 
 
 94
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 Pursuant to Federal Rule of Appellate Procedure 43(c)(1), we have substituted Donna E. Shalala for her predecessor, Louis W. Sullivan, as Secretary of the Department of Health and Human Services
 
 
 **
 The Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, is sitting by designation
 
 
 [1]
 For other, more generalized, SSI eligibility requirements, see 20 C.F.R. Sec. 416.202
 
 
 [2]
 The parties have devoted some attention to the issue of whether panhandling, or the income therefrom, can cause a person to become ineligible for SSI benefits. We decline to reach this issue. As noted above, the ALJ determined that, due to the poor area in which Dotson panhandles, the bulk of his income comes from illegal activities. We believe the ALJ's finding to be supported by substantial evidence and, therefore, leave the panhandling issue to a court with the question properly before it
 
 
 [3]
 See Bell v. Sullivan, 817 F.Supp. 719 (N.D.Ill.1993) (Marovich, J.); Jones v. Sullivan, 804 F.Supp. 1045 (N.D.Ill.1992) (Holderman, J.); Curtis v. Sullivan, 764 F.Supp. 119 (N.D.Ill.1991) (Bua, J.); Moore v. Sullivan, 1992 WL 199257 (N.D.Ill. Aug. 4, 1992) (Reinhard, J.; unpublished); Love v. Sullivan, 1992 WL 86193 (N.D.Ill. Apr. 22, 1992) (Conlon, J.; unpublished); Dugan v. Bowen, 1989 WL 281911 (S.D.Ill. Nov. 8, 1989) (unpublished), rev'd on other grounds sub nom. Dugan v. Sullivan, 957 F.2d 1384 (7th Cir.1992); Hart v. Sullivan, 824 F.Supp. 903 (N.D.Cal.1992). Cf. Hammonds v. Celebrezze, 260 F.Supp. 992 (N.D.Ala.1965) (claimant's illegal manufacture of whiskey not conclusive evidence of SGA absent evidence of earnings)
 
 
 [4]
 For a reconstituted formulation of the above definition, see 20 C.F.R. Sec. 416.910, which provides: "Substantial gainful activity means work that--(a) Involves doing significant and productive physical or mental duties; and (b) Is done (or intended) for pay or profit."
 
 
 [5]
 Accordingly, substantial but non-remunerative volunteer work would fall short of SGA because people normally do not volunteer their services for pay or profit. See SOCIAL SECURITY LAW AND PRACTICE Sec. 37:4 at 8 (Timothy E. Travers et al. eds., 1987). Evidence of such volunteer work, however, could be used to deny a claimant benefits at a later stage in the sequential evaluation process. See 20 C.F.R. Sec. 416.971
 
 
 [6]
 In contrast to the OASDI provisions of the Act, the SSI program is particularly concerned with a claimant's financial situation:
 The basic purpose underlying the supplemental security income program is to assure a minimum level of income for people who are age 65 or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level.
 
 
 [20]
 C.F.R. Sec. 416.110 (emphasis added); see also id. at Sec. 416.1100 ("the amount of income you have is a major factor in deciding whether you are eligible for SSI benefits"). Thus, a claimant not engaging in SGA and otherwise eligible for the SSI program will be denied benefits if he or she has too much income or too many resources. See 42 U.S.C. Sec. 1382(a); generally 20 C.F.R. Subpts. K, Sec. 416.1100 et seq. (income) and L, Sec. 416.1201 et seq. (resources)
 
 
 [7]
 For example, acting as a lookout at a drug house might constitute a gainful yet insubstantial activity, whereas someone who chronically engages in acts of vandalism may be substantially, but not gainfully, occupied
 
 
 [8]
 Indeed, were we to hold otherwise, the court would be creating the perverse incentive--although admittedly only at the margins--for both SSI claimants and recipients to engage in illegal activity because the income therefrom would be ignored
 
 
 [9]
 Again, however, the resources and income analysis implicated here and discussed at note 6, supra, is different from the ALJ's responsibility to determine whether a claimant is engaging in SGA
 
 
 [10]
 Dotson also argues that the ALJ erred by underestimating the amount of money he earned through panhandling. As we discussed at note 2, supra, the ALJ's decision to discount Dotson's panhandling income--because of the poor area in which he begs--is supported by substantial evidence
 
 
 [11]
 Moreover, this is not an instance where the claimant's testimony was of such dubious veracity that the ALJ should have discredited it. Dotson's claim to spending $200 to $300 per day on heroin and cocaine, while on the high side, is certainly within the realm of possibility. See, e.g., Hart v. Sullivan, 824 F.Supp. 903 (N.D.Cal.1992) (claimant "presently consumes seven or eight twenty-dollar bags of heroin daily ..., uses crack every night ..., and drinks approximately eight half-pints of hard liquor daily")
 
 
 [12]
 We are inclined to agree with Dotson that Congress has envisioned the application of the Act to substance abusers. See, e.g., 42 U.S.C. Sec. 1382(e)(3)(A) (requiring SSI recipients who are alcoholics or drug addicts to undergo treatment as a condition of receiving disability benefits); 42 U.S.C. Sec. 1383(a)(2)(A)(ii) (providing for payment of SSI benefits to alcoholics and drug addicts through representative payees)
 
 
 [13]
 Dotson's argument would become relevant in two situations, the first of which is beyond the court's powers generally and the second of which is not implicated in this appeal. The first scenario involves a wealthy addict who is able to satisfy his or her addiction without resort to the welfare system. Such a person, of course, is better off than Dotson, but this disparity yields him no cause of action. In the second scenario, a wealthy addict who is not engaging in SGA, but who has paid into the Social Security system, applies for and receives OASDI benefits. This person, again undoubtedly better off than Dotson, presumably would be ineligible for SSI benefits due to an excess of resources and income. See generally note 6, supra. Importantly, however, Dotson is not in a position to make this argument because the ALJ below did not deny him benefits based on his income or resources, but rather based on the fact that Dotson was engaging in SGA