**James GAUDREAU, Plaintiff,**

v.

**COMMISSIONER OF SOCIAL SECURITY, Defendant.**

No. 300CV1219(JCH).

United States District Court, D. Connecticut.

Aug. 22, 2001.

John Serrano, West Hartford, CT, for plaintiff.

Ann M. Nevins, Bridgeport, CT, for defendant.

*RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE DECISION OF THE COMMISSIONER AND ON DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER*

FITZSIMMONS, United States Magistrate Judge.

This is an action under section 405(g) of the Social Security Act, 42 U.S.C. § 405(g), in which plaintiff, James Gaudreau, seeks review of the Commissioner's denial of his claim for disability insurance benefits. Pending are plaintiff's motion for summary judgment reversing the decision of the Commissioner [Doc. # 6] and defendant's motion for order affirming the decision of the Commissioner [Doc. # 12]. For the reasons that follow, **plaintiff's motion [Doc. # 6] is GRANTED and defendant's motion [Doc. # 12] is DENIED.**

### I. *Background*

Plaintiff was born on September 17, 1937. (*See* R. 72.) He left high school in the ninth grade and completed an additional year and a half at Putnam Trade School, where he was trained as a mason. (*See* R. 96.) Plaintiff worked as a mason for twenty years. (*See* R. 40, 107.) After that, he began working in the auction business, owning and operating Smiling Jim's Trading Post. (*See id.*) When plaintiff was first diagnosed with congestive heart failure he sold the building in which Smiling Jim's had been operating. (*See* R. 41.) However, he continued to actively run an auction business under the name Smiling Jim's in rented halls. (*See* R. 30, 41–42.) Plaintiff stated in his original application that he first became unable to work on September 1, 1998, when he was ordered to stop working by his doctor. (*See* R. 90.) However, at the hearing before the ALJ, he requested that the date for the declared onset of his disability be changed to March 19, 1997, when he suffered a bout of bilateral pneumonia. (*See* R. 28.) Plaintiff last met the disability insured status requirements of the Act on December 31, 1997. (*See* R. 16.) He describes his disability as weakness, lethargy and occasional chest pains due to his chronic heart disease, a condition which plaintiff claims was seriously aggravated by his bilateral pneumonia of March 1997. (*See* R. 41, 48, 57.)

On September 22, 1998, plaintiff filed an application for disability insurance benefits. (*See* R. 72.) This application was initially denied and was then denied on reconsideration on December 25, 1998. (*See* R. 62–65.) On February 10, 1999, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*See* R. 66.) The hearing was held on August 4, 1999, before ALJ John Mason. (*See* R. 23.) Plaintiff appeared with counsel at the hearing. (*See id.*) An unfavorable decision was issued by ALJ Mason on September 21, 1999. (*See* R. 14.) The Appeals Council affirmed this decision on May 13, 2000. (*See* R. 7.)

The plaintiff stated, at his hearing, that he was still on several medications, including Coreg, Lanoxin, Coumadin, Isosorbide, K–Lyte, Capoten and nitroglycerin, all for his heart condition. (*See* R. 128.) Plaintiff stated that he does not formally see a physician on a regular basis. Instead, he accompanies his wife on her appointments to Dr. Robinson's office as needed, averaging six times a year. On these occasions he informally discusses his condition with Dr. Robinson and undergoes routine blood tests. (*See* R. 57, 58.)

Plaintiff first became ill during the winter of 1985. (*See* R. 41, 90, 131.) Plaintiff reported a persistent cough and increasing difficulty in breathing to his physician in February of that year. (*See* R. 158.) He was referred at that time to Day Kimball Hospital in New London, where he was diagnosed with congestive heart failure (*see id.*) and placed on several heart medications (*see* R. 149).

Plaintiff continued in the auction business, but sold his auction house and reduced his activity. (*See* R. 42.) Plaintiff stated that, after his first congestive heart failure diagnosis, "I managed to make a living ... but not to the extent that I used to." (*Id.*) Plaintiff's chronic heart condition has progressively worsened, and he was diagnosed in 1990 with ischemic congestive cardiomyopathy. (*See* R. 149.)

Plaintiff suffered a case of bilateral pneumonia in March of 1997. (*See* R. 163.) Plaintiff stated that when he sought treatment from his physician, Dr. Robinson, the doctor recommended that he be hospitalized. (*See* R. 52.) However, since plaintiff had no health insurance at that time, Dr. Robinson agreed for him to be treated with intravenous antibiotics on an outpatient basis. (*See id.*) When he was not in the hospital during the period of his outpatient treatment, plaintiff stated that he was always at home, remaining sedentary, "sitting in a chair like I promised him." (*See* R. 53, 54.)

Plaintiff stated at his hearing that the pneumonia, in conjunction with his chronic heart condition, had "taken half the wind out of my sails." (R. 43.) He stated that he never fully recovered from this weakened state after March 1997. (*See id.*) Plaintiff said that from March 1997 through September 1998 he spent no more than ten or twelve hours a week directing the operations of the auctions. He would often work two or three hours in the morning and then feel "knocked down" and have to take the rest of the day off. (*See* R. 56, 179.) In his disability claimant's questionnaire, he stated that, "when I contracted double pneumonia I felt my work capabilities decrease[d] even further—I found myself feeling very tired, chest discomfort etc. as time went on." (R. 121.)

On September 8, 1998, plaintiff helped lift several heavy mantels for an auction. (*See* R. 44, 179.) Plaintiff stated that, although that level of activity "was something that I wasn't accustomed to doing," on that particular day he "wasn't feeling too bad" and since the man he had sold the mantels to had no one to unload them, he decided to help. (R. 44.) Although plain-

tiff experienced no chest pain that day, he awoke during the night with extreme discomfort and difficulty breathing. (*See* R. 44, 179.) The next morning he checked himself into the hospital and was again diagnosed with congestive heart failure. (*See* R. 178.) He was treated at this time with additional medications, told to "absolutely rest" for the next two weeks and not to undergo any heavy activity following that. (*See* R. 178, 186.) In his application, plaintiff stated, "the doctor tells me my heart is so damaged [by the] ischemic cardiomyopathy . . . that I can no longer work or become stressed." (*See* R. 121.) Plaintiff stated at his hearing that he stopped working completely at this time, except to refer calls about auctions to his son, who now runs the entire business. Plaintiff's condition has steadily declined, and he now feels too weak to be active more than one or two hours a day, or do any strenuous tasks. (*See* R. 54.)

Before March of 1997, the ordinary course of plaintiff's business required him to work full days and do fairly heavy work, such as bringing furniture items for auction up and down flights of stairs. (*See* R. 50.) In his application, he stated that he had to lift up to fifty pounds and frequently lifted up to twenty-five pounds. He stated that after the pneumonia he was forced to stop doing the lifting almost entirely, and to seriously cut back on the number of hours he spent managing the business. (*See id.*) Before this time, plaintiff would manage his auctions and do almost all the purchasing, promotion and selling himself. (*See* R. 51.) Plaintiff testified that after his pneumonia, and when auctions were scheduled, he would work a maximum of ten to twelve hours per week. (*See* R. 58.) During the auctions, plaintiff would only work when his son needed a break and, even then, only for fifteen minute intervals. (*See* R. 51.) Plaintiff estimated that, at most, his labor contribution

to the auction business amounted to twenty percent. (*See* R. 58–59.)

During the hearing, the ALJ also heard testimony from plaintiff's son, Kevin Gaudreau. He stated that his father operated the auction business until 1997, although he was weakened by the first congestive heart failure and continued to go "down hill" after that time. (*See* R. 35.) However, Kevin Gaudreau stated that his father hasn't worked at all in the last three or four years, since the pneumonia of 1997 had really, "knocked the wind out of his sails." (*Id.*) Kevin Gaudreau said that the most his father would do with the auction business since his pneumonia would be to come along on house calls to look at an estate, and that this would only happen, "once or twice a year." (*See id.*)

In his application for social security insurance, plaintiff stated that his life is currently seriously affected by his disability. (*See* R. 113–121.) He stated that he cannot do any lifting, that he has trouble climbing stairs, cannot comfortably stand for more than an hour, and cannot walk for more than a quarter of an hour without resting. (*See id.*) He stated that using his hands extensively causes numbness and tingling in his fingers. (*See id.*)

Plaintiff also completed an activities questionnaire. (*See* R. 125–127.) In this, he stated that the only household chores he participates in are occasional light lawn care using his riding lawnmower. (*See id.*) While at home, he watches television, reads, and receives frequent visits from his family or friends. (*See id.*) He stated that he usually only leaves the home to go to church, occasionally accompanies his wife grocery shopping, and visits friends in the mornings for coffee. (*See id.*) Although plaintiff has a valid drivers license and can drive short distances without trouble, on occasions when he has to travel

more than ten miles he asks his son to drive him. (*See id.*) Plaintiff stated that discomfort in his chest occasionally wakes him during the night, even though he is on medication to help him sleep. (*See* 114, 127.) The interviewer for his initial social security claim said that during the interview, "[h]e had noticeable difficulty breathing. He gets confused easily and he doesn't seem to understand at times." (*See* R. 105.)

Administrative Law Judge John Mason rendered an unfavorable decision on this matter on September 21, 1999. (*See* R. 11–17.) In his decision, he found that the plaintiff had "engaged in substantial gainful activity since his amended alleged onset date", applying the appropriate standard of 20 C.F.R. 404.1574. (*See id.*) He based this finding on Internal Revenue Service records of plaintiff's gross business sales for 1997, which were $331,348. (*See* R. 15, 87.) This amount is slightly higher than plaintiff's gross sales amounts prior to this point. (*See* R. 83–87.) Since the plaintiff's amended alleged onset date was in the early spring of 1997, the ALJ found that to maintain and even increase his previous level of sales, plaintiff's work activity must have "involved significant physical or mental activities for pay or profit." (*See* R. 16.) The ALJ also based his finding on two notes written by Dr. Robinson. The first stated that plaintiff had been "working as usual" in August 1998. (*See* R. 15.) The second note was written by Dr. Robinson in September of 1998, after plaintiff injured himself lifting the heavy mantels. (*See* R. 15, 206.)

In a letter to plaintiff regarding this case, his accountant stated that plaintiff's "net earned income has been declining since [his] disability came into effect." (R. 81.) The accountant stated that the fact that plaintiff's gross sales during 1997 were higher than normal is an indication of "several large estate sales, a buyer premium and the increasing market price for antiques", rather than an indication that the plaintiff had been as active, or even more so, during 1997 as he had been previously. (*Id.*) In fact, plaintiff's accountant noted that the number of auction sales decreased significantly from 1992 to 1997. (*See id.*) When asked why the business' gross sales increased in 1997, plaintiff recalled a single, very large auction that by itself accounted for "$80,000, [to] $90,000." (*See* R. 50.) The accountant also stated that plaintiff's realized net income dropped substantially in 1997 and after, due in large part to the extra help he had to employ to continue operating his business. (*See* R. 81.) His labor and contracted services costs, as reported to the IRS, rose from $6,185 in 1995 and $7,164 in 1996 to $13,524 in 1997. (*See* R. 84, 86–87.)

Plaintiff submitted copies of accountant-prepared summaries of his business and personal income as reported to the IRS for the years 1993–1997. (*See* R. 81–87.) This information indicated that, although gross sales for the business in 1997 equaled $331,348, plaintiff earned no income for the year. (*See* R. 87.) Plaintiff and his wife reported joint (non earned) income for 1997 from a variety of sources. (*See* R. 87.) What current income plaintiff had appears to come largely from real estate investments he owns jointly with his wife. (*See* R. 55, 81.) He stated that he does not do any physical maintenance on this property. (*See id.*)

Plaintiff's primary physician, Dr. Robinson, wrote a letter to the Social Security Administration, expressing his surprise at their denial of plaintiff's claim. (*See* R. 207) In this letter, he stated that after the pneumonia of March, 1997, plaintiff, "never went back to his full activity." (*Id.*) Moreover, Dr. Robinson says that he knew, "through social contacts in town that

[plaintiff] truly was limited by his symptoms [in the later part of 1997]." (*Id.*) Indeed, in light of the nature of the plaintiff's heart condition, he characterizes the fact that plaintiff has "continued to survive" as miraculous. (*Id.*)

On May 13, 2000, the Appeals Council issued notices denying review and making an additional exhibit submitted by plaintiff part of the record. (*See* R. 7–9.) This appeal followed.

## II. *Standard of Review*

 The scope of review of a social security disability determination involves two levels of inquiry. The court must first decide whether the Commissioner applied the correct legal principles in making the determination. Next, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Yancey v. Apfel,* 145 F.3d 106, 110 (2d Cir.1998). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel,* 23 F.Supp.2d 179, 189 (D.Conn.1998); *Rodriguez v. Califano,* 431 F.Supp. 421, 423 (S.D.N.Y.1977). The court may not decide facts, reweigh evidence or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala,* 1 F.3d 571, 577 (7th Cir.1993). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. Furthermore, " '[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles.' " *Schaal v. Apfel,* 134 F.3d 496, 504 (2d Cir.1998) (quoting *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987)).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. *See* 42 U.S.C. § 423(a)(1). Additionally, indigent individuals may be entitled to disability benefits under the Supplemental Security Income program. 42 U.S.C. §§ 1381–1383(c). "Disability" is defined under both programs as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1), 1382c(a)(3).

Determining whether a claimant is disabled requires a five-step process. *See* 20 C.F.R. § 404.1520. First, the court must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1510(b), 404.1572(b). If the claimant is currently employed, the claim is disallowed. *See* 20 C.F.R. § 404.1520(b). If the claimant is not working, as a second step, the agency must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is denied. *See* 20 C.F.R. § 404.1520(c). Once the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in appendix 1 of the regulations (the "Listings"). *See* 20 C.F.R. § 404.1520(d); *Bowen v. Yuckert,* 482 U.S. 137, 141, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Balsamo v. Chater,* 142 F.3d at 79–80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(d); *Balsamo v. Chater,*

142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(e). If the claimant cannot perform his former work, he must show, as a fifth and final step, that he is prevented from doing any other work. A claimant is entitled to receive disability benefits only if he cannot perform any alternate gainful employment. *See* 20 C.F.R. § 404.1520(f).

■ The initial burden of establishing disability is on the claimant. *See* 42 U.S.C. §§ 423(d)(5). Once the claimant demonstrates that he is incapable of performing his past work, however, the burden shifts to the Commissioner to show that the claimant has the residual functional capacity to perform other substantial gainful activity in the national economy. *See Balsamo v. Chater,* 142 F.3d at 80 (citing cases).

### III. *Discussion*

Following the five step evaluation process, the ALJ determined that the plaintiff engaged in substantial gainful activity after his amended alleged onset date of March 19, 1997. (*See* R. 15.) The ALJ based his decision on Internal Revenue Service documents that indicate plaintiff had gross sales of $331,348 for 1997, and two separate statements by plaintiff's treating physician that plaintiff had been working with the business. (*See id.*) Thus, he did not proceed with the remainder of the evaluation process and denied

disability insurance benefits. (*See* R. 16–17.)

■ Plaintiff argues that the ALJ's decision "constitutes [an] error of law because it is contrary to 20 C.F.R. § 404.1575(a)" and because the ALJ failed to use any of the three methods outlined in that section in determining whether plaintiff was engaged in substantial gainful activity. Plaintiff also argues that the ALJ's reliance on the two statements made by Dr. Robinson was in error because the statements alone did not contradict plaintiff's testimony and the ALJ had to resort to speculation in interpreting Dr. Robinson's statement that plaintiff was "working as usual." [1]

In response, the defendant contends that the ALJ's decision is supported by substantial evidence. The court considers these arguments below.

■ Under the Social Security Act, a claimant is eligible for disability benefits only if his or her impairment or impairments are so severe that he or she is unable to engage in any substantial gainful activity. The regulations define substantial gainful activity as follows:

substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.... Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is

---

1. The Court assumes that the ALJ found plaintiff's testimony to be credible and credited it to the fullest extent possible. Although the Commissioner is free to accept or reject the testimony of any witness, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams on Behalf of Williams v. Bowen,* 859

F.2d 255, 260–61 (2d Cir.1988) (citing *Carroll v. Secretary of HHS,* 705 F.2d 638, 643 (2d Cir.1983)). In this case the ALJ made no finding as to plaintiff's credibility. To the extent that the ALJ did not find plaintiff to be credible, the failure to set forth reasons for this finding constitutes reversible error. *See* Social Security Ruling ("SSR") 96–7p, 1996 WL 374186, at *4 (S.S.A.).

the kind of work usually done for pay or profit, whether or not a profit is realized.

20 C.F.R. § 404.1572(a), (b).

For self-employed individuals, the regulations provide specific guidance in determining whether a person is engaged in substantial gainful activity. First, if a claimant is self-employed, "[s]upervisory, managerial, advisory or other significant personal services that you perform ... may show that you are able to do substantial gainful activity." 20 C.F.R. § 404.1573(d).

The regulations next provide three methods for testing whether a self-employed individual is engaged in substantial gainful employment.

(1) Test One: You have engaged in substantial gainful activity if you render services that are significant to the operation of the business and receive a substantial income from the business....

(2) Test Two: You have engaged in substantial gainful activity if your work activity, in terms of factors such as hours, skills, energy output, efficiency, duties, and responsibilities, is comparable to that of unimpaired individuals in your community who are in the same or similar businesses as their means of livelihood.

(3) Test Three: You have engaged in substantial gainful activity if your work activity, although not comparable to that of unimpaired individuals, is clearly worth the amount shown in § 404.1574(b)(2) when considered in terms of its value to the business, or when compared to the salary that an owner would pay to an employee to do the work you are doing.

20 C.F.R. § 404.1575(a). The regulations describe the meaning of "significant services" if the business

involves the services of more than one person [the Social Security Administration] will consider you to be rendering significant services if you contribute more than half the total time required for the management of the business, or you render management services for more than 45 hours a month regardless of the total management time required by the business.

20 C.F.R. § 404.1575(b)(1). In determining "substantial income," the agency

deducts your normal business expenses from your gross income to determine net income. Once we determine your net income, we deduct the reasonable value of any significant amount of unpaid help furnished by your spouse, children, or others.... That part of your income remaining after we have made all applicable deductions represents the actual value of the work performed.

20 C.F.R. § 404.1575(c). The regulations specifically state that the claimant's income alone will not be considered, "because the amount of income you actually receive may depend on a number of different factors...." 20 C.F.R. § 404.1575(a).

 In this case, the ALJ did not base his decision on any of the tests outlined in Section 404.1575. The ALJ's failure to make findings under any of the three tests constitutes error as a matter of law and requires this court to remand to the ALJ for an analysis under Section 404.1575. The ALJ was first required to determine if plaintiff engaged in "services significant to the operation of the business and receive[d] a substantial income from the business." 20 C.F.R. § 404.1575(a)(1). There are no findings as to whether plaintiff provided significant services or whether he received a substantial income from the business. In fact, the record seems to indicate that, at most, plaintiff's services constituted twenty percent of that neces-

sary to run the business and that, during 1997, plaintiff reported no earned income. The court finds that the ALJ's reliance on the increase in the business' gross sales in 1997 and the two physician statements insufficient to constitute substantial evidence as a basis for determining substantial gainful activity under this test. On remand, the ALJ is directed to make further findings under Section 404.1575 to determine whether plaintiff's services were "significant to the operation of the business" *and* whether plaintiff received a "substantial income from the business." 20 C.F.R. § 404.1575(a)(1), (b), (c). *See also Rams v. Chater,* 989 F.Supp. 309, 316–17 (D.Mass. 1997).

In addition, the ALJ committed error as a matter of law in relying upon the gross sales of the business rather than plaintiff's net income in deciding that he was engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1575(c) *See also Ogden v. Apfel,* 1998 WL 372638, *3 (W.D.Va. June 29, 1998). The ALJ is directed to consider plaintiff's income according to the guidelines established in the regulations. If plaintiff's income for the relevant period falls below the earnings guidelines in 20 C.F.R. § 404.1574(b)(2), the ALJ is directed to make findings as to other relevant factors and to proceed with an analysis pursuant to 20 C.F.R. § 404.1575(a)(2), (a)(3). *See also* 20 C.F.R. § 404.1573 (general information about work activity).

Finally, if the ALJ determines that plaintiff has not engaged in substantial gainful activity under test one, he must consider tests two and three. *See* 20 C.F.R. § 404.1575(a). The ALJ must make findings supporting his decision on whether plaintiff engaged in substantial gainful activity under these tests, and if necessary proceed with the remainder of the five-step analysis.

## IV. *Conclusion*

For the reasons stated above, the court concludes that the ALJ's decision is not supported by substantial evidence. Plaintiff's Motion for Summary Judgment [**Doc. # 6**] is *granted in part.* The motion is granted to the extent that the decision of the Commissioner is reversed and the case is remanded for further proceedings consistent with this decision. The Defendant's Motion for Order Affirming the Decision of the Commissioner [**Doc. # 12**] is *denied.*

The parties are free to seek the district judge's review of this recommended ruling. *See* 28 U.S.C. § 636(b) (**written objection to ruling must be filed within ten days after service of same**); Fed.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989) (**failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit**).