John R. BULARZ, Plaintiff–Appellant,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant–Appellee.

No. 95–3092.

United States Court of Appeals, Seventh Circuit.

Argued March 26, 1996.

Decided Aug. 19, 1996.

Allan D. Krezminski (argued), Milwaukee, WI, for Plaintiff-Appellant.

Daniel E. Conley, Patricia K. McDowell (argued), Quarles & Brady, Milwaukee, WI, for Defendant-Appellee.

Before ESCHBACH, MANION and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

John R. Bularz brought this defamation action against his former employer, Prudential Insurance Company of America (Prudential), in Wisconsin state court, alleging that several employees of Prudential had made defamatory statements about his business practices. Prudential removed the suit to federal district court on the basis of diversity of citizenship, and asserted a counterclaim alleging that Bularz had made misrepresentations to customers of Prudential in breach of his duties as their employee. At the close of trial, the jury returned a special verdict indicating that neither Prudential nor Bularz were liable on the respective claims against them. The district court entered judgment pursuant to the jury's special verdict and denied Bularz's motion for a new trial. Bularz appeals, asserting that the district court erred in its formulation of the special verdict questions, and in admitting certain items of evidence that pertained to Bularz's character and reputation. Bularz further maintains that the court misapplied the statute of limi-

tations in refusing to permit him to amend his complaint to include a tortious interference with contract claim against Prudential. For the reasons that follow, we affirm.

## I. BACKGROUND

Bularz was hired as an insurance salesman by Prudential in March 1987. At the time, Bularz sold life insurance policies from a regional office located in Waukesha, Wisconsin. Bularz primarily dealt in policies having both insurance and investment features, which he sold to senior citizens. Although Bularz was generally successful in selling life insurance and was promoted to sales manager approximately two years after joining Prudential, a number of customers were dissatisfied, and complained to Prudential that Bularz had engaged in deceptive marketing practices. Most of the complaints asserted that Bularz had provided misleading information to customers about the actual cost of the insurance policies he sold. Some customers also asserted that Bularz had sold them policies that they neither wanted nor needed. As a result of these complaints, Prudential gave Bularz two written warnings in October 1990 and January 1991, and required Bularz to submit to a disciplinary compliance review in March of 1991. By the late summer of 1991, Prudential had received thirteen separate complaints from its customers regarding Bularz's alleged misrepresentations. As a result of these complaints, Prudential began an internal investigation of Bularz's selling practices. Soon after the investigation was completed, Bularz was demoted from sales manager to sales agent, and was placed on probation on November 8, 1991. Harry Axford, a regional vice president at Prudential, participated in the decision to demote Bularz and to place him on probation. Within days of being placed on probation, Bularz tendered his resignation to Prudential and started his own financial services business, K.T. Financial Services.

K.T. Financial Services was comprised of Bularz and eight other insurance agents, several of whom were also former employees of Prudential. These included Bularz's son, John S. Bularz, his sister, Joan Masters, and a friend, Roger Staude. In December 1991,

Bularz signed a contract to sell life insurance policies as a general agent with the Midland National Life Insurance Company of Sioux Falls, South Dakota (Midland). During the period between December 1991 and March 1992, Bularz and the other members of K.T. Financial Services submitted 133 applications to Midland from prospective customers seeking life insurance policies. In response to these applications, however, only ten insurance policies were issued. During the same time frame, the rate of acceptance of applications for life insurance policies presented to Midland by other insurance agents was approximately seventy-five percent. In order to uncover the reason behind his poor rate of acceptance, Bularz requested a meeting in late March 1992 with Mark Stone, a Midland sales manager. Joan Masters was also present at the meeting, as were several other K.T. Financial Services members. At the close of the meeting, Bularz formed the opinion that the only reason his company had been unsuccessful in selling insurance for Midland was because certain persons at Prudential had made defamatory statements to Midland about his business practices, and that Midland had therefore been reluctant to issue insurance policies pursuant to the applications it had received through agents at K.T. Financial Services. On November 8, 1992, Midland finally terminated its contract with Bularz.

Bularz filed a complaint against Prudential on March 7, 1994, in the Circuit Court of Milwaukee County, Wisconsin. In that complaint, he alleged that Prudential, through its agents, had made false statements to third persons indicating that Bularz was "dishonest and untrustworthy and unsafe to trade with," and specifically named Prudential employees Greg Ormund, Doris Oestacher, Bonnie Duffrin and Lisa Nagel as the individuals who had made these defamatory statements. Bularz further alleged that as a result of being defamed, persons who had previously dealt with him had ceased to do so, causing him to be deprived of the ability to pursue his profession. Prudential removed the complaint to federal district court on the basis of diversity jurisdiction and filed a counterclaim alleging that during his employment with Prudential, Bularz's deceptive business prac-

tices had damaged Prudential's reputation. Bularz then filed an amended complaint on June 1, 1994, in which he added several new allegations in support of his defamation claim, including one that on or about April 6, 1992, Harry Axford had told Midland senior vice president Alan H. Spencer that Spencer "should run, not walk, to get away from John Bularz and his son, because they are crooks, and that is why Prudential got rid of them." On the basis of that incident, as well as the other facts alleged, Bularz also asserted a new claim against Prudential for tortious interference with contract.

Prior to trial, the district court ruled that Bularz would be allowed to proceed on his defamation claim, but that his tortious interference with contract claim was time-barred. The court also ruled that it would allow Bularz to present evidence regarding Axford's alleged defamatory statement. With respect to Axford's statement, and over defense counsel's hearsay objection, Bularz presented the testimony of Joan Masters, who recounted the following conversation that was alleged to have occurred at the March 1992 meeting between Mark Stone and members of K.T. Financial Services:

Q. What did Mr. Stone say?

[Objection overruled.]

THE WITNESS: [...] He said that Alan Spencer called Cathy McDowell—MacDonald—McDowell–Cathy—and she said that, well, the Bularzes are really being—they're under suspicion right now and they're being investigated by the NASD.

And so Mr. Spencer said then—I mean, said that then Mr. Spencer called—Allen Stone [sic] said—Mr. Stone said Mr. Spencer called Mr. Axford and he said run don't walk from the Bularzes because they're crooks and that's why Prudential got rid of them.

Q. And when did this conversation take place?

A. About the 20th of March, 23rd of March, something right around there.

Q. Near the end of March?

A. Uh-huh.

Q. Was that of 1992?

A. Yes, it was.

(Trial Tr. Vol. 3 at 465–66.) On cross examination, Masters conceded that she never personally spoke with Alan Spencer concerning this alleged conversation between Spencer and Axford, and that she never actually heard Spencer speak with any employee of Prudential at any time. (*Id.* at 490.)

Bularz also presented three additional items of evidence pertaining to Axford's statement: (1) the testimony of Mark Stone of Midland concerning a conversation he had with Bularz in March or April of 1992, which was secretly tape-recorded by Bularz, (2) a letter from Spencer to Prudential's counsel, in which Spencer stated that he vaguely remembered speaking with someone at Prudential concerning Bularz, but that he could no longer recall whether that person was Harry Axford or someone else, and (3) a telephone message slip, dated "4/14," showing that a telephone call from Spencer, who was seeking information about Bularz, had been directed to Axford's secretary, Cathy MacDonald.

In the tape-recorded conversation with Bularz, Stone made the following remarks concerning Axford's alleged defamatory statement: "... when he [Alan Spencer] called and asked for Harry Axelford [sic] and says, well, who's this in reference to, and Allen [sic] says John Bularz. And she says he's not handling that investigation. They switched him to somebody else. It was a big investigation on, or something." (Appellant's App. at 139; Ex. 55A.) After the tape-recording was played at trial, Stone testified that although he remembered overhearing someone at Midland say that a Prudential employee had referred to Bularz and his son as "flimflam men," or something to that effect, he could no longer recall who at Midland had made that statement. (Trial Tr. Vol. 1 at 151–52.) Stone further testified that he did not remember Spencer ever stating that he had discussed this matter with Axford, and that he, Stone, did not personally speak with anyone at Prudential regarding Bularz. (*Id.* at 153–54).

With respect to the letter from Spencer to Prudential's counsel, Bularz points to the deposition testimony of Spencer as providing

support for his assertion that Spencer spoke with Axford concerning Bularz's business practices. In that deposition, Spencer stated that he vaguely remembered speaking with someone at Prudential concerning Bularz, and that the person he spoke with might have been Axford, but that he was no longer certain of the person's identity or of the substance of their conversation. (Spencer Dep. at 11–12, 15–16.) Spencer also testified that the name "Axford" sounded vaguely familiar to him as someone he might have spoken with at Prudential, but that the name "MacDonald" did not. (*Id.* at 15–16.) Spencer denied, however, that Midland had terminated its contract with Bularz for any reason other than the fact that Midland had become dissatisfied with Bularz's marketing program because of the customer complaints it had received concerning Bularz's selling techniques. (*Id.* at 6–7.)

In her deposition, which was read into the record at trial, Cathy MacDonald identified the telephone message slip recording Spencer's telephone call to Prudential as having been directed to her. MacDonald testified that she remembered speaking with someone from another insurance company about both Bularz and his son, but stated that she was no longer certain whether that person had been Spencer. (Trial Tr. Vol. 5 at 825–26.) MacDonald also acknowledged that it was her duty to speak with other insurance companies to verify employment dates and provide references for former Prudential employees, and that she routinely did so. (*Id.* at 825.) At trial, Axford testified that according to office procedure, MacDonald returned calls from other companies involving requests for references and verification of employment, and that he, Axford, never provided references for former employees. (Trial Tr. Vol. 7 at 1107–08, 1116.)

In order to demonstrate that Bularz's reputation was already seriously compromised at the time Prudential employees were alleged to have defamed him, the district judge allowed Prudential to introduce a notebook compiled by Prudential employee Michael Buelow containing letters of complaint from fifty Prudential customers regarding Bularz's business practices. The notebook also included documents prepared by Prudential employees that provided information about Prudential's investigation and its ultimate disposition of each complaint. On the issue of Bularz's reputation, the judge also admitted testimony concerning a fraud action that had been filed against Bularz and K.T. Financial Services by the estate of Rosalie Pollack (Trial Tr. Vol. 7 at 1136–45), as well as testimony from Wesley Schneider, who had spoken with Bularz during the summer of 1992 about obtaining an insurance policy. Schneider testified that after purchasing the policy from Bularz, he discovered that the premium schedule Bularz had given him appeared to have been altered to make the required payments appear less costly than they actually were. (*Id.* at 1121.) Schneider further testified that he then decided to cancel the policy, and had great difficulty in obtaining a refund of his initial premium payment. (*Id.* at 1121–22.) As a result of this incident, Schneider came to the conclusion that Bularz was unethical in his sales practices. (*Id.* at 1122.)

At the close of trial, Bularz's counsel proposed that the jury be given a written question asking it to determine whether any employee of Prudential had stated that Bularz was a "flimflam man." The district judge rejected this formulation of the question on two separate grounds. The judge first determined that if the proposed question were accepted, the court would be required to instruct the jury that it must reach unanimous agreement concerning which Prudential employee had made the alleged statement, and that this would complicate the jury instructions unnecessarily. Second, the judge concluded that there had been no evidence introduced at trial to support a finding that anyone other than Cathy MacDonald had made a defamatory statement about Bularz, and that the written question should therefore be limited to asking whether MacDonald had said that the plaintiff was a "flimflam man." (Trial Tr. Vol. 8 at 1199–1200.) For this reason also, the district court rejected Bularz's alternative formulation of the special verdict, in which Bularz proposed that the court ask the jury whether Harry Axford had made the alleged statement. (*Id.* at 1192, 1200.) At the close of its

deliberations, the jury returned a special verdict indicating that Cathy MacDonald did not say that Bularz was a "flimflam man," and that Bularz did not breach his employment duties to Prudential. The district court entered judgment accordingly, and rejected Bularz's subsequent motion for a new trial. Bularz now appeals.

## II. DISCUSSION

Bularz's first challenge is to the special verdict form. He contends that the district court abused its discretion in refusing to allow the jury to consider whether Harry Axford had defamed Bularz. As Bularz has averred, we review a district court's refusal to submit a proposed special verdict question under Federal Rule of Civil Procedure 49(a) only for an abuse of discretion. *See United States Fire Ins. Co. v. Pressed Steel Tank Co.*, 852 F.2d 313, 316 (7th Cir.1988); *Hibma v. Odegaard*, 769 F.2d 1147, 1157 (7th Cir. 1985); *see also Gong v. Hirsch*, 913 F.2d 1269, 1278 (7th Cir.1990) (abuse of discretion standard governs review of district court's refusal to give requested special interrogatories under Rule 49(b)). In general, special verdict questions must accurately present to the jury all the material issues in the case that were raised by the pleadings and the evidence. *See United States Fire Ins. Co.*, 852 F.2d at 316, 318; *Hibma*, 769 F.2d at 1157. It follows, of course, that a district court is not required to formulate a special verdict question that has no factual basis in the evidence properly admitted at trial. *Cf. United States Fire Ins. Co.*, 852 F.2d at 316, 318. At the jury instruction conference, Bularz asked the district court to submit a question concerning whether Axford had defamed him. Bularz has therefore preserved for review the district court's refusal to submit that question to the jury. *See Matei v. Cessna Aircraft Co.*, 35 F.3d 1142, 1146 (7th Cir.1994); *McDaniel v. Anheuser–Busch, Inc.*, 987 F.2d 298, 306 (5th Cir.1993); Fed. R.Civ.P. 49(a).

Bularz contends that the testimony of Joan Masters, together with the other evidence that Alan Spencer of Midland had spoken with Axford concerning Bularz, was sufficient to support a special verdict question on the issue of whether Axford had uttered the defamatory statement as alleged. After Bularz submitted the proposed question, the district judge considered defense counsel's argument that Masters' testimony consisted of double hearsay and was otherwise unreliable. In refusing Bularz's request for the special verdict question, the district judge observed that "there was no evidence to support a finding that anyone other than Cathy MacDonald may or would have made that type of statement." (Trial Tr. Vol. 8 at 1199.) The judge further observed that if the jury were to find that someone other than MacDonald had made the defamatory statement, the court "would be required to set that answer aside because of the lack of evidence to support such a finding." (*Id.* at 1200.) Although the district judge overruled defense counsel's hearsay objection to Masters' testimony at the time the testimony was offered, the court's refusal to submit the issue to the jury on the ground that there was "no evidence" to support the requested special verdict question, when evaluated in the context of defense counsel's renewed hearsay objection to that testimony, demonstrates that the judge considered Masters' testimony to have been improperly admitted in the first instance. Without that testimony, the district judge apparently concluded that the remaining evidence could not support a jury question on the issue of Axford's role in defaming Bularz.

Our review of the challenged testimony, and the other evidence cited by Bularz in support of his theory that Axford was responsible for defaming him, leads us to conclude that the district judge did not abuse his discretion in refusing to submit the proposed special verdict question to the jury. In her testimony, Joan Masters stated that Midland sales manager Mark Stone told her that Spencer told him that Axford had labeled Bularz and his son "crooks," and had advised Midland not to deal with them. (Trial Tr. Vol. 3 at 465–66.) Axford's alleged statement to Spencer is not hearsay because it was offered to prove that Axford made the defamatory statement rather than to show that the matter asserted in the statement was true (*see* Fed.R.Evid. 801(c)). Stone's

account of his alleged conversation with Spencer does, however, represent a first level of hearsay, not falling under any exception. *See* Fed.R.Evid. 802, 803. Masters' testimony concerning Stone's account of that conversation constitutes a second level of hearsay, and was therefore inadmissible to prove that Axford made the defamatory statement. *See id.*

Moreover, as the district court noted during the jury instruction conference, Masters' testimony appeared to be unreliable (and thus undoubtedly lacked the "circumstantial guarantees of trustworthiness" needed to admit it under Rule 803(24)) in light of other evidence that Bularz had adduced on the issue of Axford's responsibility for defaming him. (Trial Tr. Vol. 8 at 1199–1200.) According to Masters' testimony, the meeting between Stone and members of K.T. Financial Services during which Stone disclosed Axford's defamatory statement took place on or about March 20, 1992. (*Id.*) If Masters' version of events were correct, then Axford's alleged defamation of Bularz must have occurred before March 20, 1992, when it was reported to Masters by Stone. (*Id.*) Yet the telephone message slip Bularz has offered in support of his theory that Axford spoke with Spencer, and thus had an opportunity to defame Bularz just as Masters asserts, shows that the alleged conversation between Spencer and Axford occurred on April 14, 1992 or thereafter. (*Id.;* Appellant's App. at 128, Ex. 13.) As the district judge observed, the evidence that Bularz has produced to substantiate Masters' version of events tends instead to undermine her account. (Trial Tr. Vol. 8 at 1199–1200.) In short, the court was well within its discretion in refusing to base a special verdict question on Masters' hearsay testimony.

With Masters' testimony excluded, the remaining evidence either fails to point to any specific Prudential employee as being a possible source of the alleged defamatory statement, or tends to show that MacDonald may have been responsible for making the statement. For example, Stone testified that he vaguely remembered overhearing a Midland employee say that someone at Prudential had impugned Bularz's business practices, but he also testified that he had no recollection of the identity of the Midland employee who had reported that statement. Stone further testified that he never spoke with anyone at Prudential about Bularz, and thus had no personal knowledge concerning who, if anyone, might have defamed him. Similarly, Alan Spencer's letter and deposition testimony tend to show that Spencer had heard of Harry Axford, and that he had a vague recollection of having spoken with someone at Prudential about Bularz. Spencer also testified that he could no longer be certain whether that conversation involved Axford or some other Prudential employee. Indeed, far from providing evidence that Spencer actually spoke with Axford about Bularz, this testimony merely shows that Spencer was reluctant to deny the possibility that such a conversation took place due to his lack of a clear recollection of the matter. (Spencer Dep. at 11–12.) Moreover, because Spencer could not remember the substance of any conversation he might have had with Prudential concerning Bularz, his testimony provides no confirmation of Bularz's claim that he was defamed by a Prudential employee. Finally, the telephone message slip, when considered together with the testimony of Cathy MacDonald and Harry Axford, is the only evidence Bularz produced that identified a particular Prudential employee (namely, MacDonald) as being responsible for defaming him. Thus, the district judge did not abuse his discretion in concluding that the evidence offered at trial could only support a special verdict question on the issue of whether MacDonald had made the alleged defamatory statement against Bularz.

■ Bularz's assertion that the district court erred in admitting certain items of evidence that pertained to Bularz's reputation and business practices need not detain us. Bularz challenges the admission of (1) Prudential's compilation of fifty customer complaints it received about Bularz's sales practices; (2) testimony concerning a fraud action brought against Bularz by Rosalie Pollack's estate; and (3) testimony from Wesley Schneider regarding Bularz's unethical sales practices. These three items of evidence were relevant to determining whether Prudential's alleged defamatory statement was

true, and thus to deciding whether Prudential had an affirmative defense to Bularz's claim. The challenged evidence was also relevant to determining whether Bularz's reputation was already compromised at the time that Prudential allegedly defamed him, and thus to the jury's computation of damages. In addition, the notebook containing the customer complaints against Bularz was relevant to deciding the merits of Prudential's counterclaim that Bularz had breached his employment duties to Prudential. As we have already discussed, because the jury found that no defamatory statement was made, it never considered whether the alleged statement was true, or whether and to what extent the statement harmed Bularz's reputation. Indeed, because the jury did not reach the issues raised by the challenged evidence, it never considered any of this evidence in reaching the conclusion that Cathy MacDonald did not utter the defamatory statement. Moreover, after being allowed to review the notebook containing the fifty customer complaints Prudential had offered in support of its counterclaim, the jury nevertheless determined that Bularz did not breach any employment duties he owed to Prudential. Thus, there is no need for us to consider whether the district court erred in admitting these items of evidence as Bularz maintains, since any error in this regard was undoubtedly harmless. *See Groom v. Days Inn of America, Inc.*, 62 F.3d 204, 208 (7th Cir.1995).

■ Bularz also contends that the district court erred in holding that his claim of tortious interference with contract, which he asserted for the first time in his amended complaint, was time-barred. Bularz maintains that the statute of limitations does not bar this additional claim against Prudential because his amended complaint relates back to the date of the original complaint, in which he asserted a defamation claim against Prudential on the basis of the same factual allegations that underlie his tortious interference with contract claim in the amended complaint. *See* Fed.R.Civ.P. 15(c)(2). Although we agree with Bularz that the district court erred in holding that the new claim was time-

barred, we nevertheless conclude that the error was harmless.

■ Under Federal Rule of Civil Procedure 15(c)(2), an amended complaint relates back to the date of the original pleading when "the claim ... asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." *Id.* In general, relation back is permitted under Rule 15(c)(2) where an amended complaint asserts a new claim on the basis of the same core of facts, but involving a different substantive legal theory than that advanced in the original pleading. *Donnelly v. Yellow Freight System, Inc.*, 874 F.2d 402, 410 (7th Cir.1989), *aff'd. on other grounds*, 494 U.S. 820, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990); *see also Worthington v. Wilson*, 8 F.3d 1253, 1256 (7th Cir.1993) (quoting *Wood v. Worachek*, 618 F.2d 1225, 1229 (7th Cir.1980)); *Alpern v. Utilicorp United, Inc.*, 84 F.3d 1525, 1543 (8th Cir.1996) (collecting cases). Thus, a new substantive claim that would otherwise be time-barred relates back to the date of the original pleading, provided the new claim stems from the same "conduct, transaction, or occurrence" as was alleged in the original complaint; for relation back to apply, there is no additional requirement that the claim be based on an identical theory of recovery. *E.g., Donnelly*, 874 F.2d at 410; *Federal Deposit Ins. Corp. v. Bennett*, 898 F.2d 477, 479–80 (5th Cir.1990).

■ Our examination of the original and the amended complaints reveals that Bularz's defamation claim and his tortious interference with contract claim were both based on the same events alleged in his original complaint. Bularz should therefore have been allowed to proceed on his tortious interference with contract claim in addition to his defamation claim. As Prudential points out, however, the district court's refusal to allow Bularz to proceed on both claims did not prejudice Bularz.[1] Indeed, although the district court ruled against Bularz on this issue, it nevertheless gave Bularz ample opportunity at trial to prove the essential factual predicate Bularz asserted in support of his defa-

---

1. It has not escaped our attention that Bularz has remained content to assert that the district judge erred in refusing to allow him to proceed on the new claim, and has failed to address Prudential's argument that the judge's error was harmless.

mation claim and his tortious interference with contract claim—namely, that employees of Prudential had disparaged his ethics and his business practices to his new patrons at Midland, causing Midland to refuse to do business with him and his new company. Absent this act on the part of Prudential, Bularz would be unable to demonstrate that Prudential tortiously interfered with his contractual relations with Midland. *See, e.g., Combined Investigative Services, Inc. v. Scottsdale Ins. Co.,* 165 Wis.2d 262, 477 N.W.2d 82, 85–86 (Ct.App.1991).[2] Yet as we have seen, the jury concluded that the alleged defamatory statement forming the basis of Bularz's tortious interference claim was never made. The jury's finding on this issue forecloses any possibility that Bularz could have maintained his tortious interference with contract claim against Prudential. *See id.* The district court's error in refusing to allow Bularz to amend his complaint to include that claim was therefore harmless.

### III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

**2.** Under Wisconsin law, tortious interference with contract requires proof of "conduct which induces or otherwise intentionally causes a third person not to perform a contract." *Id.* 477 N.W.2d at 85.