Terri **CHISHOLM**, Plaintiff,

v.

**FOOTHILL CAPITAL CORPORATION, Norwest Corporation, and Scott Diehl and Michael Sadilek in their individual and official capacities,** Defendants.

No. 96 C 1174.

United States District Court,
N.D. Illinois,
Eastern Division.

May 4, 1998.

---

928

Mary Stowell, Linda Debra Friedman, Leng, Stowell, Friedman & Vernon, Chicago, IL, for Terri Chisholm, plaintiff.

Marshall Lee Blankenship, Paul E. Lehner, Adducci, Dorf, Lehner, Mitchell & Blankenship, P.C., Chicago, IL, for Foothill Capital Corporation, Scott Diehl, Michael Sadilek, defendants.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

Plaintiff Terri Chisholm has filed a six-count second amended complaint against defendants, Foothill Capital Corporation ("Foothill Capital"), Norwest Corporation ("Norwest"), and Scott Diehl ("Diehl") and Michael Sadilek ("Sadilek"), in their individual and official capacities, (collectively "defendants"). In Count I, plaintiff claims that Foothill Capital and Norwest discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* In Count II, plaintiff claims that Foothill Capital and Norwest discriminated against her on the basis of her sex with respect to her wages in violation of Title VII and the Equal Pay Act ("EPA"), 29 U.S.C. § 206. In Count III, plaintiff claims that Foothill Capital and Norwest retaliated against her for opposing their discriminatory practices in violation of Title VII. In Count IV, plaintiff claims that Foothill Capital, Norwest, and Diehl retaliated against her for opposing their unfair wage practices in violation of the Fair Labor Standards Act, which encompasses the EPA. In Counts V and VI, respectively, plaintiff asserts a defamation claim and an invasion of privacy claim against Foothill Capital, Norwest, and Sadilek, under Illinois law. The following motions are presently before the court: (1) Norwest's motion for summary judgment; (2) Foothill Capital, Diehl, and Sadilek's motion for summary judgment, which Norwest has adopted; (3) plaintiff's motion to strike the motion for summary judgment filed by Foothill Capital, Diehl, and Sadilek, and the declaration of Phillip J. Coffin; and (4) Foothill Capital, Diehl, and Sadilek's motion to strike paragraphs 1–5 and 9 of the declaration of David Chisholm.

## FACTS

The following facts are undisputed except where otherwise noted.

### The Parties

Foothill Capital is a commercial lender engaged in the business of providing financing and money management services to businesses. Norwest is a diversified financial services company. Norwest operates through subsidiaries engaged in banking and various related businesses, such as venture capital investment. Foothill Capital is a wholly-owned subsidiary of Foothill Group, Inc. ("Foothill Group"). Foothill Group is a wholly-owned subsidiary of Norwest. Norwest acquired the stock of Foothill Group on October 19, 1995.

Foothill Capital hired plaintiff in October, 1989 to work as a credit underwriter in its Los Angeles office. In mid–1991, plaintiff became a calling officer. In 1994, plaintiff became a marketing representative. While she was employed at Foothill Capital, plaintiff was the only female marketing representative. Diehl was employed by Foothill Capi-

tal as a senior vice president in marketing and was plaintiff's immediate supervisor. Sadilek was another marketing representative and worked with plaintiff.

**Plaintiff's Relationship with David Chisholm**

Plaintiff met her husband, David Chisholm ("Chisholm"), in 1991 or 1992 when she called on him in her capacity as a calling officer. Chisholm was a managing director for Bankers Trust Company in Chicago, a company involved in a business similar to the business of Foothill Capital. Chisholm was married at the time. At some point, plaintiff and Chisholm became romantically involved. At some time after that, in late 1993 or early 1994, plaintiff told several friends at Foothill about her affair with Chisholm. Sometime in 1993, plaintiff and Chisholm began appearing in public together as a couple. In the fall of 1993, Chisholm separated from his then wife, Joyce Chisholm ("J. Chisholm"). J. Chisholm filed for divorce later that year. In February, 1994, plaintiff and Chisholm attended a professional conference together in Colorado. Plaintiff has testified that she believed it was "obvious" at the conference that they were a couple.

When plaintiff learned that Foothill Capital was opening a Chicago office, she requested that she be transferred there in order to be with Chisholm. Diehl already knew that plaintiff was romantically involved with Chisholm, and understood that their relationship was the reason for plaintiff's request. Plaintiff was transferred to the Chicago office, where Sadilek had just been hired. Plaintiff arrived in Chicago in June, 1994, and began living with Chisholm in his residence. Chisholm divorced J. Chisholm on July 20, 1994, and married plaintiff in September, 1994. After their marriage, plaintiff and Chisholm continued to live in Chisholm's residence.

**Alleged Discrimination**

Plaintiff claims that she was discriminated against because of her sex in various ways during her employment at Foothill Capital. Plaintiff asserts that male underwriters were made marketing representatives directly,

while she was forced to work as a calling officer—a less favorable position created solely for her—for almost two years before becoming a marketing representative. Defendants claim that plaintiff's work as a calling officer gave her an advantage once she became a marketing representative.

Plaintiff asserts that she had to complain once she was promoted to get her title changed and to obtain a car allowance, while these benefits were provided immediately to males who became marketing representatives. She has testified that she was forced to surrender to Sadilek names on her list of contacts and potential clients, known as "referral sources." Plaintiff could only specifically identify one referral source that she was forced to give up: Kevin Delaplane. The parties dispute whether plaintiff or Sadilek had a stronger relationship with him.

Plaintiff asserts that her performance and earning capacity [1] were diminished because all of the "house referrals" (potential clients that are located internally by Foothill Capital management) were assigned to male marketing representatives for development. She also asserts that similarly-situated male marketing representatives were paid at higher grade levels.

Plaintiff asserts that her 1994 performance review, which she received from Diehl in March 1995, was also discriminatory. In that review, plaintiff received an overall rating of 3.01 on a 4.0 scale. Under Foothill Capital's rating system, a 3.0 indicates that the employee is "achieving objectives" and a 4.0 indicates that the employee is "exceeding objectives." Although plaintiff generally rated her performance higher in her self-appraisal, she did not rate herself above a 3.5 in any category. Initially, Diehl did not plan to recommend that plaintiff be promoted. Diehl, however, reconsidered his decision later that day and told plaintiff that she would be promoted to vice president. Plaintiff's promotion and accompanying $4000 salary increase were made retroactive to January 1, 1995. Plaintiff asserts that she had to com-

---

1. The bonuses that marketing representatives receive are based on the number and size of the deals that they close. The bonuses can be quite substantial. For example, plaintiff's bonus for 1994 was $98,881. Her salary that year was $60,000.

plain about her evaluation to obtain this promotion, while males who did not perform as well were held to lower standards and recommended for promotions.

When Foothill Capital leased new office space, Sadilek took the largest office for himself. Plaintiff claims she was entitled to the larger office. Defendant disputes this. The parties, however, agree that Diehl told them to resolve the dispute themselves and flip a coin if necessary. Plaintiff and Sadilek agreed to this. Plaintiff lost the coin flip.

Plaintiff also claims that she was excluded from networking and mentoring opportunities presented to her male peers, such as golf outings and business dinners. Between June 1994 and November 1995, Diehl participated in golf outings with Sadilek on approximately seven occasions. Plaintiff played in two of these of these outings. Plaintiff was invited to attend one of the other outings, but declined the invitation. One of the other outings took place at a men's club, where a potential client belonged. One of the outings took place in Atlanta when Diehl and Sadilek arrived early for a conference and played by themselves. Plaintiff has never set up a golf outing with Diehl, and Diehl has never declined a social invitation from plaintiff.

Plaintiff specifically claims that she was not invited to a dinner held at a conference in Washington, D.C. in October, 1995. She has testified that she does not know who attended the dinner, but that a co-worker, Paula Wolf ("Wolf") told her that everyone else from the marketing department had been invited. Wolf has testified that she organized an informal dinner on October 25, 1995, for Foothill personnel who were unable to find referral sources to entertain at dinner. Wolf has testified that plaintiff did not advise her that she was available for dinner that evening and that, as a result, she assumed plaintiff was dining with referral sources, as was expected of all marketing representatives. Plaintiff has testified that she had dinner with her husband that night.

Plaintiff also claims that she was excluded and isolated because it was common for Foothill Capital's male managers and salespersons to attend strip clubs in connection with business-related matters. Sadilek has testi-fied that he and Diehl have gone to strip clubs together on several occasions. Sadilek has testified that other Foothill Capital salespeople accompanied them on at least one occasion. Craig Noell ("Noell"), another marketing representative, has testified that he went to strip clubs with Diehl on at least two occasions either in 1994 or 1995. Noell testified that he has never been to a strip club with a prospective client or referral source. Jim Marasco ("Marasco"), another marketing representative, has testified that he went to strip clubs with other Foothill Capital employees on a number of occasions in California, Illinois, Louisiana, New Mexico, Oregon, Texas, and Washington, D.C. Marasco has testified that various people accompanied him, including Diehl, Sadilek, and Peter Schwab ("Schwab"), the president of Foothill Capital. When asked if any referral sources accompanied him to a strip club in New Orleans, Marasco responded "I think so." Schwab has testified that he went to strip clubs with Foothill Capital employees in Chicago and Dallas.

Finally, plaintiff claims that Foothill Capital held parties at industry conferences and hired entertainment that degraded women. A cardboard cutout of a model in a transparent T-shirt was placed at one party, apparently so that people could have their picture taken with it. At another party, Foothill Capital hired a woman to dressed as a mermaid. At another, Foothill Capital hired cheerleaders for entertainment.

### The Overlap Comment

In August, 1995, Diehl and Sadilek paid a marketing call on Fretter Appliance Company ("Fretter"), which is located in suburban Detroit. Sadilek had learned that Fretter was experiencing financial difficulties. He had therefore called John Hurley ("Hurley"), a Fretter representative, and asked if he would be interested in talking to Foothill Capital about financing. Diehl, Sadilek, Hurley, and another Fretter representative, Dale Campbell ("Campbell"), were present at the meeting in Detroit. Diehl and Sadilek knew that Fretter's lender at the time was Banker's Trust, and that Chisholm was responsible for the Fretter account. Sadilek has testified that he told Hurley and Campbell

that a woman in his office was married to Chisholm because he thought Fretter might believe that the relationship created some conflict of interest. Sadilek did not mention plaintiff's name. Sadilek has testified that Hurley said, "I didn't know that Dave was remarried" or something to that effect. Sadilek has testified that he then said, "there was some overlap there," referring to the overlap between Chisholm's previous marriage and his relationship with plaintiff. According to Sadilek the conversation about plaintiff lasted between 30 seconds and one minute. The meeting then continued and the parties discussed the possibility of a lending relationship.

After hearing about Sadilek's comment from Chisholm, plaintiff complained about the incident to Ellyn Norwood ("Norwood"), Foothill Capital's Director of Human Resources. Chisholm complained to Schwab, the president of Foothill Capital. Plaintiff also spoke to Diehl about the comment. Norwood told plaintiff that she would discuss the incident with Diehl. Later that day, Norwood told plaintiff that Sadilek would be required to go to California to discuss the incident.

Diehl contacted Sadilek and told him to report to Foothill Capital's Los Angeles office. Sadilek did so, and met with Diehl and Schwab for approximately one hour. Sadilek has testified that Diehl and Schwab were very upset and yelled at him. They told Sadilek that his comment was insensitive and that he would be fired if he ever did anything like that again. They also told Sadilek that a written warning would be placed in his personnel file. After the meeting with Sadilek, Schwab met with Diehl and reprimanded him for allowing Sadilek's comment to pass without taking action.

Norwood and Diehl each telephoned plaintiff and told her that Sadilek had received a severe warning and had a memo placed in his file. Plaintiff has testified that Diehl was "nasty" during this conversation and implied that the comment was not Sadilek's fault. Sadilek returned to Chicago and, according to plaintiff, was "very apologetic." Plaintiff accepted his apology.

### Alleged Retaliation

Plaintiff claims that Diehl retaliated against her in various ways whenever she complained. Specifically, she claims that Diehl retaliated by excluding her from golf outings and dinners. According to plaintiff, Diehl became more hostile after she complained about the overlap comment. She asserts that the "nasty" phone call described above was retaliatory. She has testified that he turned his back on her and excluded her from a conversation. She has also testified that Diehl used to get back to her more quickly, but began taking several days to return her phone calls.

As of October 12, 1995, plaintiff had closed only two financing deals. Diehl met with plaintiff on that date to discuss her performance. He stated that he was not sure that the Chicago market could support two salespeople. He also told plaintiff that if she did not book a couple of deals over the next few months, she and Foothill Capital would "have to go their separate ways." Diehl stated that he would be watching her performance closely in the first and second quarter of 1996, and that if she was not meeting her goals by the middle of 1996, that "would probably be it." Diehl has testified that he asked plaintiff if she needed any help, but she said she did not. Although Diehl did not specifically say that he was going to terminate her, plaintiff asserts that his statements constituted a retaliatory threat of termination.

### Plaintiff's Resignation

Plaintiff left Foothill Capital in November, 1995. Her last day in the office was November 1, 1995. Plaintiff had oral surgery on November 2, 1995, and did not return to work thereafter. Plaintiff claims that Sadilek later told Frank Rant ("Rant"), an employee of a Foothill Capital competitor, that Foothill Capital fired plaintiff for "double dealing" between Foothill Capital and her husband's company Banker's Trust.

### DISCUSSION

### I. SUMMARY JUDGMENT STANDARDS

A movant is entitled to summary judgment under Rule 56 when the moving papers and

affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1209 (7th Cir.1993). Once a moving party has met its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir.1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Fisher v. Transco Services–Milwaukee, Inc.*, 979 F.2d 1239, 1242 (7th Cir.1992).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Stewart v. McGinnis*, 5 F.3d 1031, 1033 (7th Cir.1993). This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## II. THE RELATIONSHIP BETWEEN NORWEST AND FOOTHILL CAPITAL

 Plaintiff was hired and employed by Foothill Capital. Yet, she seeks to hold both Foothill Capital and Norwest liable for violating Title VII and the EPA as a "single employer." Under the single employer theory of liability, "the interrelation of two nominally separate business entities may lead a court to consider them as a single entity" for the purposes of liability in employment discrimination cases. *Rogers v. Sugar Tree Prod., Inc.*, 7 F.3d 577, 582 (7th Cir.1993) (applying doctrine in case involving the Age Discrimination in Employment Act ("ADEA")); *see also Knight v. Entertainment Publications, Inc.*, No. 95 C 3642, 1996 WL 172138, at *2 (N.D.Ill. April 10, 1996) (applying doctrine in case involving the ADEA, Title VII, and the Americans with Disabilities Act); *Richard v. LeSalle Talman Bank*, No. 94 C 1799, 1995 WL 234633, at *9 (N.D.Ill. April 19, 1995) (applying doctrine in Title VII case). When determining whether two corporations should be treated as a single employer, the court must consider whether the following factors exist: (1) the interrelation of operations, such as common offices, common record keeping, and shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control. *See Rogers*, 7 F.3d at 582. "Although the presence or absence of any one factor is not controlling ... 'control over the elements of labor relations is a central concern.'" *Id.* (quoting *Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir.1983)). The fact that entities in question are interrelated is insufficient; the plaintiff must show that the businesses are "highly integrated with respect to ownership and operations" to warrant a finding that they constitute a single employer. *Id.* at 583 (citations omitted). "'[T]he most important requirement is that there be sufficient indicia of an interrelationship ... to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer.'" *Id.* (quoting *Armbruster*, 711 F.2d at 1337).

Plaintiff has failed to meet that standard in this case. It is undisputed that Foothill Group became a subsidiary of Norwest on October 19, 1995, and that plaintiff's last day in the office was November 1, 1995. Virtually all of the allegedly discriminatory conduct took place before Norwest was even affiliated with Foothill Group or Foothill Capital. The only conduct that plaintiff specifically claims she suffered between October 19, 1995, and

November 1, 1995, was her exclusion from a golf outing and an informal dinner at a conference in late October. These incidents alone could not support a discrimination claim. Moreover, there is no evidence of any involvement by Norwest in these incidents. Although Norwest, Foothill Group, and Foothill Capital became affiliated two weeks before plaintiff's last day at work, she has presented no evidence that Norwest and Foothill Capital acted as a single employer *while* plaintiff was being discriminated against. The degree to which Norwest, Foothill Group, and Foothill Capital became interrelated *thereafter* is irrelevant. This court has recognized that when determining, for example, whether the required centralized control of labor relations exists, the "critical question" is "[w]hat entity made the final decisions regarding employment matters *related to the person claiming discrimination?*" *Richard v. LeSalle Talman Bank,* No. 94 C 1799, 1995 WL 234633, at *12 (N.D.Ill. April 19, 1995) (emphasis added) (internal quotations and citations omitted). Whether an entity made decisions regarding the employment matters of other individuals at a later date is not the issue. Accordingly, the court finds, as a matter of law, that Norwest and Foothill Capital do not constitute a single employer for the purpose of plaintiff's discrimination claims. Norwest's motion for summary judgment is granted as to Counts I, II, III, and IV.[2]

■ The single employer theory of liability originated in the area of labor relations, and has since been in applied in cases involving employment discrimination. *Rogers v. Sugar Tree Prod., Inc.,* 7 F.3d 577, 582 (7th Cir.1993). The parties agree that the doctrine has not been applied to cases involving common law torts, such as plaintiff's defamation and invasion of privacy claims. *See Line v. Fey, Inc.,* No. 97 C 3759, 1997 WL 538715, at *5 n. 1 (N.D.Ill. Aug.27, 1997) (acknowledging the difference between the test for

equitable piercing of the corporate veil under state law and the single employer test applicable to discrimination claims). Under Illinois law, "a corporation is a legal entity separate and distinct from its shareholders, directors and officers, and generally, from other corporations with which it may be affiliated." *Van Dorn Co. v. Future Chem. and Oil Corp.,* 753 F.2d 565, 569 (7th Cir.1985). Nevertheless, the separate existence of a corporation will be disregarded and the veil of limited liability will be pierced if: (1) there is such unity of interest and ownership that the separate personalities of the corporation and the individual, or other corporation, no longer exist and (2) the situation is such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Id.* at 569–70. In its motion for summary judgment, Norwest argues that plaintiff cannot meet the standard for equitable piercing as a matter of law. In her response, plaintiff offers to voluntarily dismiss her state law claims against Norwest, effectively conceding Norwest's argument. Accordingly, Norwest's motion for summary judgment is also granted with respect to Counts V and VI.

### III. MITIGATION

■ A Title VII claimant, such as plaintiff, has a statutory duty to use reasonable and diligent efforts to secure suitable employment in order to mitigate her damages. 42 U.S.C. § 2000e–5(g); *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). Defendants, however, bear the burden of proving, as an affirmative defense, that plaintiff failed to mitigate her damages. *EEOC v. Ilona of Hungary, Inc.,* 108 F.3d 1569, 1581 (7th Cir. 1997). To prevail, defendants must prove: (1) that plaintiff "[was] not reasonably diligent in seeking other employment" and (2) "that with the exercise of reasonable diligence there was a reasonable chance that [plaintiff] might have found comparable em-

---

2. Plaintiff argues that Foothill Capital alone cannot reinstate her or provide her with lost stock options and future pension benefits, which she claims are controlled by Norwest. Thus, she asserts that she will not be able to obtain complete relief unless Norwest is a defendant. These arguments, however, do not establish that Nor-

west and Foothill Capital acted as a single employer while plaintiff was a Foothill employee and was allegedly being discriminated against. Although plaintiff has not advanced the argument, the evidence does not appear to justify keeping Norwest in this case as a "relief" defendant either.

ployment." *Id.* (internal citations and quotations omitted).

Defendants have provided ample evidence that plaintiff was not reasonably diligent in seeking other employment. Although plaintiff talked to a few "headhunters" over the phone and looked through the paper, she did not update her resume, make any contacts with employers herself, or use any placement or job counseling services. She did not talk to anyone she knew in the industry about returning to work. Nor did she ask her husband to talk to anyone about employment opportunities for her. Although she accompanied her husband to conferences and other industry functions, she did not talk to anyone there about returning to work. Plaintiff did not apply for unemployment either. Instead, she began writing a novel full-time. She has not earned any income since she left her position at Foothill Capital. Although plaintiff claims she was too distraught and humiliated to return to work as a lending market representative, she has admitted that she did not see a health professional for any physical or emotional difficulties, and that she has not taken medication other than Advil.

Defendants have also provided evidence, in the form of the affidavit of Phillip J. Coffin ("Coffin"),[3] that jobs were available in plaintiff's industry. Defendants, however, must establish more than the mere availability of jobs; they must establish that the jobs available were comparable to plaintiff's previous position and that there was a reasonable chance that plaintiff might have obtained one of these jobs. Plaintiff asserts that Coffin admitted at his deposition that he is not familiar with plaintiff's employment history, her earnings at Foothill Capital, or her educational background.[4] Without this type of information, Coffin cannot testify adequately about either the similarity between plaintiff's position at Foothill Capital and the available jobs or the probability that plaintiff would have obtained one of those jobs. Therefore,

whether plaintiff would have obtained comparable employment remains a disputed issue of fact. Accordingly, defendants' motion for summary judgment is denied with respect to the issue of mitigation.

## IV. CONSTRUCTIVE DISCHARGE

Title VII makes it "unlawful ... for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Title VII's prohibition against discrimination is not limited to economic or tangible discrimination. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Rather, it extends to " 'discriminatory intimidation, ridicule, and insult' " in the workplace that is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Id.* (quoting *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). The standard for a hostile work environment claim under Title VII is both objective and subjective. *Id.* 510 U.S. at 21–22, 114 S.Ct. 367. Based on the totality of the circumstances, plaintiff must demonstrate that the alleged discriminatory conduct created an environment that a reasonable person would find hostile or abusive and that the victim actually perceived as abusive. *Id.*

Title VII also recognizes a "constructive discharge" doctrine that permits a plaintiff to resign and bring suit against her employer as if she were fired. To succeed on a theory of constructive discharge, the plaintiff must demonstrate that her working conditions were so intolerable in a discriminatory way that they would have compelled a reasonable person to resign. *Chambers v.*

---

3. Plaintiff has moved to strike defendants' motion for summary judgment and Coffin's affidavit. She argues that defendants failed to disclose Coffin during discovery and did not designate him as an expert. Plaintiff, however, deposed Coffin at length and has therefore suffered no prejudice. Moreover, contrary to plaintiff's argument, Coffin is competent to testify about the

matters contained in his affidavit. Plaintiff's motion to strike is therefore denied.

4. Although plaintiff fails to cite Coffin's deposition to support her assertion, defendants do not contest this point.

*American Trans Air, Inc.*, 17 F.3d 998, 1005 (7th Cir.1994). Circumstances that might be adequate to establish a hostile working environment for purposes of Title VII will not necessarily support a constructive discharge claim, which requires the plaintiff to demonstrate harassment that is more severe or pervasive. *Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir.1992), *aff'd*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Brown v. Ameritech*, No. 95 C 3914, 1997 WL 43224, at *11 (N.D.Ill. Jan. 27, 1997), *aff'd*, 128 F.3d 605 (7th Cir.1997). Thus, " '[a]n employee must seek legal redress while remaining in his or her job unless confronted with an "aggravated situation" beyond "ordinary" discrimination.' " *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423 (7th Cir.1989) (quoting *Bailey v. Binyon*, 583 F.Supp. 923, 929 (N.D.Ill.1984)).

▪ The court finds that plaintiff has presented evidence from which a jury could reasonably infer that she was discriminated against on the basis of her sex while employed at Foothill Capital. Disputed issues of fact preclude summary judgment on that issue. Nevertheless, even after drawing all reasonable inferences in her favor, the court finds, as a matter of law, that plaintiff's experiences were not intolerable. She asserts that she had to complain to obtain benefits that were freely given to males. She asserts that she was unfairly held to a higher standard than her male co-workers. She asserts that her job performance was unjustifiably criticized. She claims that she was excluded from golf outings and other office functions. These experiences do not amount to an "aggravated situation" beyond "ordinary" discrimination. *See Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996) (affirming summary judgment for employer on constructive discharge claim where plaintiff alleged that he received an unjustifiably low performance rating that resulted in the loss of a $600 discretionary bonus and that his boss told him he could quit if he was not happy with his job); *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 705 (7th Cir.1993) (affirming summary judgment for employer on constructive discharge claims where plaintiff alleged that she was "subjected to such forms of discrimination as being excluded from office activities, being reprimanded without reason, and being given one of the least lucrative sales territories, as well as not being assigned new accounts, not being allowed to supervise two white employees, and not being assisted by [one of her bosses]"); *Reed v. Knight–Ridder Fin. Americas*, No. 95 C 2426, 1996 WL 401937, at *8 (N.D.Ill. July 16, 1996) (granting summary judgment for employer on constructive discharge claim where plaintiff claimed she had to stay after hours, had to prove how excited she was, and was given a limited sales territory); *Vitug v. Multistate Tax Comm'n*, 860 F.Supp. 546, 553 (N.D.Ill.1994) (granting summary judgment for employer on constructive discharge claim where plaintiff alleged that supervisors were hostile and intimidating, excluded him from meetings, criticized his method of performing tax audits, and demanded that he sign a performance goal and argued with him when he refused to sign).

Although plaintiff was offended by the fact that her co-workers frequent strip clubs, she was not forced to go to these clubs herself. Nor has she alleged that she was ridiculed or otherwise harassed about the subject at work. Plaintiff may have been unfairly denied certain business opportunities because her co-workers and referral sources went to strip clubs, but her working conditions were not made intolerable. Placing the cardboard cutout at a party and hiring the "mermaid" and cheerleaders as entertainment may have been discriminatory or, at least, in extremely poor taste, but these actions were not directed at plaintiff and did not involve the sort of behavior normally associated with viable constructive discharge claims, such as sexual harassment or verbal abuse. Accordingly, defendants' motion for summary judgment is granted with respect to the issue of constructive discharge.

## V. WAGE CLAIMS UNDER THE EQUAL PAY ACT AND TITLE VII

▪ In Count II, plaintiff claims that she was discriminated against with respect to her compensation and benefits in violation of Title VII and the EPA. As stated above, plaintiff has presented evidence from which a jury could reasonably infer that she was discrimi-

nated against on the basis of her sex while employed at Foothill Capital. Defendants do not specifically address the merits of plaintiff's wage claims in their motion for summary judgment. Accordingly, their motion for summary judgment is denied as to Count II.

## VI. RETALIATION UNDER TITLE VII

In Count III, plaintiff claims that she was retaliated against for opposing defendants' discriminatory practices in violation of Title VII. To recover under Title VII, plaintiff must show that: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action." *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir.1994).

Defendants argue that there is no evidence of retaliation. They argue to the contrary that plaintiff was accommodated each time she complained: when she complained about her performance evaluation, she was promoted; when she complained about Sadilek taking the larger office, the dispute was resolved with a coin flip; when she complained about Sadilek's overlap comment, he and Diehl were reprimanded by the president of the company and Sadilek apologized. Plaintiff accepted his apology. In response, plaintiff asserts that she was threatened with termination by Diehl and constructively discharged in retaliation for her complaint about Sadilek's overlap comment.

■■■ The court has found as a matter of law that plaintiff was not constructively discharged. Therefore, she cannot base her retaliation claims on her resignation. Plaintiff has failed to demonstrate a link between her earlier complaints and any adverse actions. Accordingly, only the following acts of alleged retaliation, which occurred after plaintiff's complaint about the overlap comment, remain: (1) Diehl's allegedly nasty phone call; (2) plaintiff's alleged exclusion from a golf outing in October, where Diehl and Sadilek arrived early for a conference in Atlanta and played by themselves; (3) plaintiff's alleged exclusion from the informal dinner organized by Wolf; (4) plaintiff's alleged

exclusion from a conversation when Diehl turned his back on her; (5) Diehl's failure to return plaintiff's phone calls as quickly as he once did; and (6) Diehl's statements that plaintiff and Foothill Capital would "have to go their separate ways" and that "would probably be it" if plaintiff did not improve her performance.

■■■ Adverse employment actions must be material. *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir.1996). In other words, "a materially adverse change in the terms or conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993). The Seventh Circuit has found that such a change might be indicated by "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." Plaintiff's allegations do not fit this mold; the acts alleged do not qualify as materially adverse employment actions. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir.1998) (shunning of plaintiff by co-workers did not affect the terms and conditions of her employment and did not constitute a materially adverse employment action); *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir.1996) (negative performance evaluations alone do not constitute adverse employment actions); *Zoch v. City of Chicago*, No. 94 C 4788, 1997 WL 89231, *24 (N.D.Ill. Feb. 4, 1997) (allegations of retaliation, including allegation that defendant made a harassing and intimidating phone call to plaintiff, were insufficient to allege a materially adverse employment action because plaintiff failed to allege how the incidents affected the conditions of her employment).

■■■ The incident alleged by plaintiff closest to an adverse employment action is the conversation Diehl had with plaintiff about needing to improve her performance. Diehl's statements could reasonably be interpreted as a threat of termination. Yet, the mere threat of termination, standing alone, is only the threat of an adverse employment

action, not an adverse employment action itself.[5] Even if the mere threat of termination was an adverse employment action, the court would still reject plaintiff's claim. She has failed to present sufficient evidence that Diehl's statements—apparently stemming from plaintiff's poor performance—were the result of her complaints about the overlap comment. In addition, her complaint was not a complaint about sex discrimination. Sadilek's comment may have been inappropriate and unprofessional, but it did not evidence gender bias. Thus, plaintiff's complaint did not constitute statutorily protected expression. Accordingly, defendants' motion for summary judgment is granted as to Count III.

## VII. RETALIATION UNDER THE FAIR LABOR STANDARDS ACT

In Count IV, plaintiff claims that she was retaliated against for opposing defendants' unfair wage practices in violation of the Fair Labor Standards Act, which encompasses the EPA. The elements of a claim for retaliation under the FLSA mirror those under Title VII. *Larsen v. Club Corp. of America*, 855 F.Supp. 247, 253 (N.D.Ill.1994). Defendants argue that there is no evidence that plaintiff suffered adverse consequences as the result of a complaint about her compensation. In response, plaintiff asserts that her constructive discharge satisfies the adverse employment action requirement. As stated above, plaintiff cannot base her retaliation claims on her resignation because the court has rejected her constructive discharge claim. Plaintiff has failed demonstrate a link between any other adverse action and a complaint regarding her compensation or benefits. Accordingly, defendants' motion for summary judgment is granted as to Count IV.

## VIII. DEFAMATION

 Under Illinois law, the elements of a claim for defamation are: (1) a defama-

tory assertion of fact about the plaintiff; (2) publication; and (3) injury to the plaintiff's reputation. *Finley v. Rodman & Renshaw, Inc.*, 1993 WL 512608, at * 2 (N.D.Ill. Dec. 8, 1993). Words are considered defamatory *per se* under Illinois law if they: "(1) impute the commission of a criminal offense; (2) impute infection with a loathsome communicable disease; (3) impute inability to perform or want of integrity in the discharge of duties of office or employment; or (4) prejudice a party, or impute lack of ability, in his trade, profession or business." *Beasley v. St. Mary's Hosp.*, 200 Ill.App.3d 1024, 146 Ill. Dec. 714, 558 N.E.2d 677, 683 (1990). A corporate defendant is jointly and severally liable for defamatory statements actionable against its employee when the employee is acting within the scope of his employment. *Reed v. Northwestern Publ'g Co.*, 124 Ill.2d 495, 125 Ill.Dec. 316, 530 N.E.2d 474, 484 (1988).

 Plaintiff claims that Sadilek committed slander *per se* when he told Rant that Foothill Capital fired plaintiff for "double dealing" between Foothill Capital and her husband's company, Banker's Trust. Sadilek denies making such a statement. Rant has testified that Sadilek did not make such a statement to him and that he never heard anyone attribute such a statement to Sadilek.

Plaintiff has admitted that she does not know anything about the circumstances under which Sadilek allegedly made this comment. Rather, she has testified that Nancy Schimmel ("Schimmel"), an attorney she met through her husband, told her that she had heard from Donald Schwartz ("Schwartz"), another attorney at Schimmel's firm, that plaintiff had been terminated for double dealing with Chisholm. Plaintiff asserts that Schimmel has testified that either Schwartz told her that he heard about plaintiff from Rant or she inferred that Schwartz had heard about plaintiff from Rant because of

---

**5.** The court in *Harris v. City of Chicago*, Nos. 96 C 3406, 96 C 7526, 1998 WL 59873, at *17 (N.D.Ill. Feb.9, 1998), was "unwilling to say that ... alleged threats to fire [the plaintiffs] did not impact their jobs in an undesirable manner." The court therefore found that the plaintiffs had alleged a materially adverse employment action

under Title VII and denied defendant's motion to dismiss. The plaintiffs in *Harris*, however, alleged additional retaliatory acts. This court was unable to find a case in this district in which a plaintiff was permitted to base a retaliation on a single threat of termination.

his close relationship with Rant.[6] Chisholm has testified that he asked Schwartz whether the rumor about plaintiff came from Sadilek, and that Schwartz responded "well, that's where it came from." Chisholm has also testified that he then asked Schwartz "whether Sadilek told him of the double dealing comment ... or whether it came to him through his buddy, Frank Rant." Chisholm has testified that Schwartz "shrugged his shoulders and gave [him] a sheepish smile from which [he] inferred that the ... comment came to Schwartz from Rant." Schwartz has testified that he first heard that plaintiff had left Foothill Capital from Rant, but that did not recall the phrase "double dealing" being used in his conversations with Rant, Schimmel, or Chisholm. Schwartz, however, admitted that he was not absolutely certain that the phrase was not used.

The testimony of a witness that Sadilek told him or her that plaintiff was fired for double dealing would not be hearsay because it would be offered to prove that Sadilek made the statement, not that the statement was true. *Bularz v. Prudential Ins. Co. of America*, 93 F.3d 372, 377 (7th Cir.1996). Plaintiff, however, has failed to present such testimony. There are no witnesses who claim to have actually heard Sadilek make the double dealing comment. In contrast, the testimony of a witness that another individual told him or her that the defendant made a defamatory remark is hearsay, not falling within in any exception. *Id.* at 377–78. Under *Bularz*, plaintiff's testimony is quadruple-hearsay. Assuming that Schwartz actually told Schimmel that he heard the

comment from Rant, Schimmel's testimony is triple-hearsay. Assuming that Chisholm was justified in inferring that Schwartz's "sheepish grin" meant Schwartz heard the comment from Rant, Chisholm's testimony is triple-hearsay. Because plaintiff has presented no admissible evidence that Sadilek either made the double dealing comment or communicated it to anyone, she cannot establish her defamation claim. Accordingly, defendants' motion for summary judgment is granted as to Count V.[7]

## VIV. INVASION OF PRIVACY

■ There are four branches of invasion of privacy torts: (1) unreasonable intrusion upon the seclusion of another; (2) appropriation of another's name or likeness; (3) public disclosure of private facts; and (4) publicity placing another in a false light. *Roehrborn v. Lambert*, 277 Ill.App.3d 181, 213 Ill.Dec. 923, 660 N.E.2d 180, 182 (1995). Plaintiff asserts a claim under the third branch. To establish a claim for public disclosure of private facts, plaintiff must prove that: (1) publicity was given to private facts; (2) the facts were private, not public; and (3) the disclosure of facts such as the matter publicized would be highly offensive to a reasonable person. *Miller v. Motorola, Inc.*, 202 Ill.App.3d 976, 148 Ill.Dec. 303, 560 N.E.2d 900, 902 (1990).

As stated above, it is undisputed that Sadilek told Hurley and Campbell, two potential clients of Foothill Capital, that there was "some overlap" between Chisholm's marriage to J. Chisholm and his relationship with plaintiff.[8] Although Sadilek stated that Chisholm's current wife worked at Foothill Capital, he did not mention plaintiff by name.

---

**6.** Plaintiff cited page 35 of Schimmel's deposition to support this assertion, but failed to provide that page of the deposition to the court.

**7.** Defendants have moved to strike paragraphs 1 through 5 of Chisholm's declaration on the grounds that his account of his conversations with Schimmel and Schwartz constitutes inadmissible hearsay under *Bularz*. This motion is granted. Defendants have also moved to strike paragraph 9. That paragraph, which relates to plaintiff's invasion of privacy claim, will be discussed below.

**8.** In paragraph 9 of his declaration, Chisholm states: "I never told Hurley or Campbell any information about my personal life and to my

knowledge they never asked me or anyone else about this subject. To my knowledge they knew nothing about my marital status or any other information of a personal nature about me." Defendants have moved to strike this paragraph. Defendants argue that Chisholm does not offer a foundation for his assertion regarding Hurley and Campbell's mental state and that his testimony as to what they knew is speculative. Chisholm may testify that he never told Hurley or Campbell any information about his personal life, but defendants' motion to strike is granted with respect to the remainder of paragraph 9.

Plaintiff claims that Sadilek's statements constituted the public disclosure of a private fact. Defendants argue that plaintiff cannot establish any of the elements of her claim.

First, plaintiff must establish that publicity was given to private facts. *Id.* The "publicity" prong for invasion of privacy torts is different from the "publication" requirement in defamation cases. *Roehrborn,* 213 Ill.Dec. 923, 660 N.E.2d at 182 (citing Restatement of Torts (Second), § 652D, comment a, at 384). In a defamation case, "publication" requires "only that the matter be communicated to a third person." *Id.* In a case involving the public disclosure of private facts, "publicity" means "communicating the matter to the public at large or to so many persons that the matter must be regarded as one of general knowledge." *Id.* If a plaintiff has a special relationship with the individuals to whom the matter was disclosed, the publicity requirement may be satisfied by disclosure to a small number of people. *Miller,* 148 Ill.Dec. 303, 560 N.E.2d at 903. The rationale behind this rule is that the disclosure "may be just as devastating to the person even though the disclosure was made to a limited number of people." *Id.*

Defendants argue that there was no publicity because Sadilek made the overlap comment in front of only three people—Hurley, Campbell, and Diehl—and Diehl already knew about plaintiff's relationship with Chisholm. Hurley and Campbell, however, were potential clients of Foothill Capital. The Chicago office was also very small, utilizing only two market representatives. Although Hurley and Campbell were not plaintiff's clients, the fact that they were being solicited by her office might mean that she had a special relationship with them such that the publicity requirement would be satisfied. *See id.* (quoting *Beaumont v. Brown,* 401 Mich. 80, 257 N.W.2d 522, 531 (1977) (special relationship may exist between a non-public figure and her " 'fellow employees, club members, church members, family, or neighbors' "), *overruled in part on other grounds by Bradley v. Bd. of Educ. of Saranac Community Schools,* 455 Mich. 285, 565 N.W.2d 650 (1997)).

Defendants also argue that there was no publicity because Sadilek did not use plaintiff's name. "The violation of the right to be let alone undoubtedly requires the use of the personality, name or likeness of the individual." *Branson v. Fawcett Publications,* 124 F.Supp. 429, 431–32 (E.D.Ill.1954). When a plaintiff is not specifically identified, and it is only through independent knowledge that a person can determine that the defendant is referring to or depicting the plaintiff, there is no violation of the plaintiff's right to privacy.[9] *Id.* at 432–33. In this case, Sadilek did not identify plaintiff by name. On the other hand, he did identify her as Chisholm's wife and as an employee of Foothill Capital. This identification might be specific enough. The court, however, need not resolve these issues because plaintiff is unable to establish either the second or third elements of her invasion of privacy claim.

Plaintiff must establish that the facts disclosed were private, not public. *Miller,* 148 Ill.Dec. 303, 560 N.E.2d at 902. At first, plaintiff told only a few friends and family members about her affair with Chisholm. In 1993, however, plaintiff and Chisholm began appearing in public together as a couple. In February, 1994, plaintiff and Chisholm attended a professional conference together. According to plaintiff's own testimony, it was "obvious" at the conference that they were a couple. Thereafter, plaintiff asked Diehl to be transferred to Chicago so that she could be with Chisholm. After moving to Chicago in June, 1994, plaintiff began living with Chisholm in his residence. Plaintiff has testified that the fact that she moved in with Chisholm was "not anything [she] wanted to hide from anybody." Because plaintiff and Chisholm were open about their romantic relationship, it was not a private fact. *See Haynes v. Alfred A. Knopf, Inc.,* No. 91 C 8143, 1993 WL 68071, at *5 (N.D.Ill. March 10, 1993) (the fact that plaintiff was a heavy drinker was a public, not private, fact be-

9. In defamation cases, statements that may reasonably be interpreted as referring to someone other than the plaintiff cannot be actionable *per* *se. Chapski v. Copley Press,* 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195, 199 (1982).

cause his drinking was open and notorious), *aff'd,* 8 F.3d 1222 (7th Cir.1993). The fact that Chisholm did not divorce his previous wife until July 20, 1994, is a matter of public record. Because plaintiff's relationship with Chisholm and his divorce were both public facts, plaintiff cannot establish that the fact that their relationship and his previous marriage overlapped was a private fact.

 Plaintiff must also establish that the disclosure of facts such as the matter publicized would be highly offensive to a reasonable person. *Miller,* 148 Ill.Dec. 303, 560 N.E.2d at 902. "Whether the publication of an allegedly private fact rises to the level of 'highly offensive' is a question of law to be decided by the court." *Haynes,* 1993 WL 68071, at *6. In making this determination, the court should consider "the context, conduct and circumstances surrounding the publication as well as the publication itself." *Green v. Chicago Tribune Co.,* 286 Ill.App.3d 1, 221 Ill.Dec. 342, 675 N.E.2d 249, 254 (1996). Although the disclosure of facts regarding an individual's *private* romantic relationship with another person might be highly offensive in certain contexts, this case involves a *public* romantic relationship. Although it may have been inappropriate and unprofessional of Sadilek to make the overlap comment in a meeting with potential clients, the court cannot conclude it was highly offensive, especially since plaintiff made no effort to hide her relationship with Chisholm in either the personal or professional areas of her life. The tort of public disclosure of private facts is meant to protect against the disclosure of "intimate ... details the publicizing of which would be not merely embarrassing and painful but deeply shocking to the average person subjected to such exposure." *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1234 (7th Cir.1993). Disclosing the fact that an individual became involved with her husband before he divorced his previous wife would not be deeply shocking to the average person when the individuals involved were open about the affair. Because plaintiff cannot establish the elements of her invasion of privacy claim, defendants' motion for summary judgment is granted as to Count VI.

## CONCLUSION

For the reasons set forth above, Norwest's motion for summary judgment is granted as to all counts. Judgment is entered for Norwest on all counts. Foothill Capital, Diehl, and Sadilek's motion for summary judgment is granted in part and denied in part. Judgment is entered for Foothill Capital, Diehl, and Sadilek on Counts III, IV, V, and VI. Plaintiff's motion to strike the motion for summary judgment filed by Foothill Capital, Diehl, and Sadilek, and the declaration of Phillip J. Coffin is denied. Foothill Capital, Diehl, and Sadilek's motion to strike paragraphs 1–5 and 9 of the declaration of David Chisholm is granted.

Plaintiff is ordered to file an amended complaint conforming to this opinion on or before May 26, 1998; defendants shall respond thereto on or before June 12, 1998. This matter is set for a report on status on June 23, 1998, at 9:00 a.m.